# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TENNESSEE EDUCATION ASSOCIATION, KATHRYN VAUGHN, ROLAND WILSON, MICHAEL STEIN, REBECCA DICKENSON, and MARY MCINTOSH, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| LIZZETTE GONZALEZ REYNOLDS, *in her official capacity as Commissioner of the Tennessee Department of Education;* and, *in their official capacities as members of the Tennessee State Board of Education*: KRISSI McINTURFF, JORDAN MOLLENHOUR, ROBERT EBY, WARREN WELLS, RYAN HOLT, LILLIAN HARTGROVE, NATE MORROW, LARRY JENSEN, DARRELL COBBINS, and BOB SMITH, | ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

1.     This is an action brought by the Tennessee Education Association ("TEA") and Tennessee K-12 public school educators Kathryn Vaughn, Roland Wilson, Michael Stein, Rebecca Dickenson, and Mary McIntosh, challenging Public Chapter No. 493 (codified as Tenn. Code Ann. § 49-6-1019 (2021)) (the "Act") and its implementing regulations (Tenn. Comp. R. & Regs. 0520-12-04-.01–.08 (2021)) (the "Rules," together with the Act, the "Prohibited Concepts Ban" or the "Ban"). The Ban purports to restrict references to race, gender, and other subjects in Tennessee public schools and public charter schools; it threatens subjective enforcement proceedings that can be initiated by any parent, student, or public school employee, and that can result in discipline, including termination and license suspension or revocation; and it denies Tennessee's K-12 public school educators a reasonable opportunity to understand what they can teach in the classroom. The Ban is unconstitutionally vague in violation of the Fourteenth Amendment of the U.S. Constitution.

## INTRODUCTION

2.     The Act, signed into law in May 2021, prohibits the "inclu[sion] or promot[ion]" of fourteen "prohibited concepts" dealing with race, gender, and other subjects in Tennessee's K-12 public school classrooms.[1] The Act was drafted in the last days of the 2021 legislative session, passed out of House committee with almost no debate, and passed by both chambers of the Tennessee legislature in a span of just 48 hours. Eight of the Ban's fourteen "prohibited concepts" mirror a 2020 federal Executive Order, directed at federal employment training, the key portions

---

[1] Tenn. Code Ann. § 49-6-1019(a).

of which a federal court preliminarily enjoined on vagueness grounds before the Act was passed by the Tennessee General Assembly and signed into law by the Governor.[2]

3. The Act and the Rules constrain the way educators discuss the fourteen "prohibited concepts" in the classroom, using language that fails to provide constitutionally sufficient notice of the conduct it purports to prohibit. The Ban exacerbates that uncertainty by permitting standardless and subjective enforcement. The Ban's enforcement provisions threaten to entangle educators in months of administrative proceedings for simply doing their job, on pain of discipline, termination, even license revocation and the end of their career as an educator — all with no requirement of wrongful intent.

4. The Ban poses an imminent threat to teachers in public K-12 classrooms across Tennessee. Since the Ban's enactment in 2021, Tennessee educators have been faced with the threat that a student or parent will trigger an enforcement proceeding under the Ban's ill-defined standards, resulting in termination, license revocation, and reputational damage, for teaching lessons they have taught for years, taking students on field trips to sites of great historical importance, and answering students' questions about some of the most consequential issues they, and our nation, face.

5. The Ban impacts what nearly a million Tennessee public school students are learning — and not learning — every day. In Tipton County, for example, one school has replaced an annual field trip to the National Civil Rights Museum in Memphis with a trip to a baseball game. In Shelby County, a choir director fears that his decades-long practice of teaching his

---

[2] Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020) (the "Executive Order"); *see also Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) ("[T]he Court agrees . . . that Sections 4 and 5 of the Executive Order are so vague that it is impossible for Plaintiffs to determine what conduct is prohibited.").

students to sing and understand the history behind spirituals sung by enslaved people will be perceived as "divisive" or otherwise violative of the Ban. In Blount County, a 45-year veteran of Tennessee public schools working as a curricular instructor — a teacher of teachers — was entangled in months of administrative proceedings, with her job on the line, because of a single parent's complaint about an award-winning work of young adult literature that the Tennessee Department of Education ("DOE") approved and the local elected school board adopted as part of the district's curriculum. All of this is the result of the Ban's nebulous proscriptions.

6. Teachers across the state are rightfully worried that teaching even subjects required by State Board of Education ("SBOE") standards may run afoul of the Ban and subject them to disciplinary proceedings. On the one hand, according to those statewide standards, a Tennessee public school educator, teaching students in third through fifth grade, must "[e]xplain how slavery became a national issue during the mid-19th century, including the significance of: [the] *Dred Scott v. Sandford* decision."[3] On the other hand, according to the Ban, that teacher must do so without "includ[ing]" in that explanation the underlying concepts that one "race . . . is inherently superior to another race," § 49-6-1019(a)(1); that "[a]n individual should be discriminated against or receive adverse treatment because of the individual's race or sex," § 49-6-1019(a)(3); that "[a]ll Americans are not created equal and are not endowed by their Creator with certain inalienable rights, including life, liberty, and the pursuit of happiness," § 49-6-1019(a)(13); or that "[g]overnments should deny to any person within the government's jurisdiction the equal protection of the law," § 49-6-1019(a)(14). The teacher's task is impossible, because such "concepts" are inextricable from that era in our nation's history, and they underlie the institution

---

[3] Tennessee State Board of Education, *Tennessee Social Studies Standards*, 59, https://www.tn.gov/content/dam/tn/education/standards/ss/Social_Studies_Standards.pdf ("Social Studies Standards").

of slavery and the *Dred Scott* decision itself.  As discussed below, examples like this one abound when the "concepts" identified in the Ban are considered in light of the SBOE's K-12 standards.

7.     The incoherence of the Ban is further illustrated by the exceptions set forth in subparagraph (b).[4]  For example, the Ban purports to allow teachers to engage in "impartial discussion[s] of controversial aspects of history,"[5] but it leaves the key terms in that formulation undefined and therefore subject to widely varying and subjective interpretations.  And it provides no guidance to Tennessee high school teachers about how an educator can engage in an "impartial discussion" of the "economic and social impact of Jim Crow laws on African Americans,"[6] or "the state-sponsored mass murder of the Jews in Nazi-controlled lands,"[7] to state just two of many obvious examples drawn from the SBOE's statewide standards.  When the Act's sponsor and presumed drafter was asked during the brief committee debate how the history of slavery, the Holocaust or 9/11 could be discussed "impartially," he suggested that "one avenue" would be for Tennessee educators to advise students that the perpetrators of those heinous acts were "created in the image and likeness of God" — a response that only serves to confirm the impossible task facing Tennessee educators attempting to conform their conduct to the Ban's strictures.

8.     The Ban thus deprives Tennessee's public school students of the information, ideas, and skills — analytical thinking, reasoned analysis, historical understanding, debate — that are central to any concept of civic education in a democratic system.  As the Supreme Court recently explained, "America's public schools are the nurseries of democracy" and "[o]ur representative

---

[4] *See* Tenn. Code Ann. § 49-6-1019(b).

[5] *Id.* § 49-6-1019(b)(2).

[6] Social Studies Standards at 122.

[7] *Id.* at 240.

democracy only works if we protect the 'marketplace of ideas.'"[8]  More than 50 years ago, the Court similarly explained that "*[t]he classroom* is peculiarly the marketplace of ideas" and our "Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection."[9]  "Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die."[10]  In contravention of the DOE's own standards, the Ban undermines this core purpose of public education, that is, to prepare students "for their futures by opening doors to a more diverse, competitive workforce and responsible citizenry"; to help students "understand the complexity of the world" and its "changing cultural and physical environments"; to "know and understand the past; read, write and think deeply; and act in ways that promote the common good."[11]

9.      The Plaintiffs seek declaratory and injunctive relief against the Defendants who are charged with enforcing the Ban, and an order (1) declaring that the Ban violates the Due Process Clause of the Fourteenth Amendment on its face and as applied as unconstitutionally vague; and (2) permanently enjoining the Defendants from enforcing the Ban.

## PARTIES

### I.      Plaintiffs

10.      Plaintiff Tennessee Education Association ("TEA") sues on its behalf and on behalf of its members.  TEA was founded in 1865 and is a non-profit, voluntary membership organization

---

[8] *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 141 S. Ct. 2038, 2046 (2021).

[9] *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 512 (1969) (internal quotation marks and alteration omitted; emphasis added).

[10] *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

[11] Social Studies Standards at 2.

of education professionals in the State of Tennessee who work as pre-kindergarten through twelfth grade educators in the more than 140 public school districts throughout the state. TEA's mission is to protect and advocate for students, the education profession, and its members to create great public schools that prepare Tennesseans for success in a global society. The members of TEA govern their association, elect TEA's board of directors, and set TEA's policy objectives. Through these self-governance processes, the members establish TEA's mission and goals, all of which center around TEA's core values of democracy, equal opportunity, a just society, a strong profession, partnerships, advocacy, and collaborative action.

11.     TEA's voluntary membership includes directors of schools, principals, administrators, teachers, and education support employees from every school district in the state. TEA has associational standing to bring the claims herein on behalf of its educator-members because each of TEA's educator-members in the State of Tennessee is employed by a local education agency or public charter school and is therefore subject to the Ban, and because the interests TEA seeks to protect are germane to its purpose and mission.

12.     Plaintiff Kathryn Vaughn is a member of TEA and a tenured elementary visual arts teacher at Brighton Elementary School in Tipton County, Tennessee. She has been teaching in Tennessee public schools for 15 years and has been recognized for her exceptional teaching abilities, including by receiving the Tennessee Education Association's Distinguished Educator Award in 2021. Because of the Ban, Ms. Vaughn is uncertain about the topics she can discuss with her students, and she fears that she may inadvertently violate the Ban while providing classroom instruction.

13.     Plaintiff Roland Wilson is the tenured Choir Director and a music teacher at Central High School in Memphis, Tennessee ("Central High"). Mr. Wilson has been a public school

educator for 30 years and has taught music in Memphis public schools for 22 years. When teaching students musical works, Mr. Wilson includes information about the historical context in which the works were written so that students can better understand and appreciate the music they are singing. Because of the Ban's vagueness, however, Mr. Wilson is concerned that he may inadvertently violate the Ban when discussing a work's historical context.

14. Plaintiff Michael Stein is a TEA member and a tenured English teacher at Coffee County Central High School in Manchester, Tennessee. Mr. Stein has been teaching in Tennessee public schools for 20 years. Mr. Stein teaches English and English as a Second Language to high school students. Because of the Ban's vagueness, Mr. Stein fears that he may inadvertently violate the Ban while providing classroom instruction.

15. Plaintiff Rebecca Dickenson is a TEA member and a tenured school librarian at Eagleton Elementary School in Blount County, Tennessee. Ms. Dickenson has been a public school educator in Blount County for 22 years, including 18 years in her current role as a library media specialist and four years teaching middle school. Because of the Ban's vagueness, Ms. Dickenson fears that books in her library and lessons that she has taught for years may violate the Ban, and she has been unable to determine which books and lessons she is permitted to discuss with her students.

16. Through the 2022-2023 school year, Plaintiff Mary McIntosh was a tenured high school social studies teacher at Central High. Ms. McIntosh taught in Tennessee public schools for 13 years. During that time, she received recognition for her excellence in teaching, including by being named the Shelby County High School Teacher of the Year in 2019. Ms. McIntosh also taught in public schools in Illinois and Virginia for eight years prior to her work in Tennessee public schools. Through the 2022-2023 school year, Ms. McIntosh taught world history and

geography as well as two elective courses titled Facing History and Ourselves and Contemporary Issues. Ms. McIntosh expects to serve as a substitute teacher in Shelby County public schools in the 2023-2024 school year. Because of the Ban, Ms. McIntosh has been unable to determine what topics she is allowed to discuss in the classroom.

## II. Defendants

17. Defendant Lizzette Gonzalez Reynolds is the Commissioner of the DOE. She is sued in her official capacity. Commissioner Reynolds "is responsible for the implementation of law [and] policies established by the general assembly or the state board of education,"[12] including but not limited to the Ban. Defendant Reynolds, as head of the DOE, also determines appeals related to the Ban pursuant to Tenn. Comp. R. & Regs 0520-12-04(8).

18. Defendants Krissi McInturff, Jordan Mollenhour, Robert Eby, Warren Wells, Ryan Holt, Lillian Hartgrove, Nate Morrow, Larry Jensen, Darrell Cobbins and Bob Smith are members of the Tennessee State Board of Education (collectively "SBOE Members"). They are sued in their official capacity. The SBOE Members are responsible for developing and adopting education policy in the State of Tennessee, including but not limited to "policies governing . . . [t]he qualifications, requirements and standards of" licensure and certification, revocation of licenses and certifications, and evaluation of "teachers, principals, assistant principals, supervisors and directors of schools."[13] Further, the Rules provide that violations of the Ban may result in "[d]isciplinary action against a teacher . . . in accordance with" SBOE rule 0520-02-03-.09.[14]

---

[12] Tenn. Code Ann. § 49-1-201(a).

[13] *Id.* § 49-1-302(a)(5)(A)(i)-(iv).

[14] Tenn. Comp. R. & Regs. § 0520-12-04-.05(10)(b).

Disciplinary action under rule 0520-02-03-.09, including for violations of the Ban, is imposed by the SBOE.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

20. In addition, this Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57.

21. Defendants reside within this District and/or perform official duties within the State of Tennessee. This Court, accordingly, has personal jurisdiction over the Defendants.

22. Venue is proper under 28 U.S.C § 1391(b) and (e) because Defendants are public officials in the State of Tennessee, sued in their official capacities, and their offices are located in this District.

## FACTUAL ALLEGATIONS

23. Nearly 70 years ago, the Supreme Court recognized in *Brown v. Board of Education* that "education is perhaps the most important function of state and local governments. . . . It is required in the performance of our most basic public responsibilities. . . . It is the very foundation of good citizenship."[15]  Public schools, the Court has since explained, are "a most vital civic institution for the preservation of a democratic system of government," because "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open

---

[15] *Brown v. Bd. of Ed. of Topeka, Shawnee Cnty., Kan.*, 347 U.S. 483, 493 (1954).

political system if we are to preserve freedom and independence. . . .  In sum, education has a fundamental role in maintaining the fabric of our society."[16]

24.     "Teachers, obviously, are the most important component of any education plan or system."[17]  Teachers play a critical role in education's civic purpose.  "[E]ducation of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto," and that "calling always has been regarded as useful and honorable, essential, indeed, to the public welfare."[18]  Those devoted public servants who respond to the calling to be teachers bear a special "relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment," and "unwarranted inhibition upon [their] free spirit . . . has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice."[19]  "Teachers and students must always remain free to inquire, to study and to evaluate."[20]

25.     The DOE's education standards reflect these important goals and values.  For example, the Tennessee Academic Standards for Social Studies explain, in part, that "[i]t is through social studies that students prepare for their futures by opening doors to a more diverse, competitive workforce and responsible citizenry. . . .   [Students use] critical thinking, self-assessment, reasoning, problem-solving, collaboration, and investigation in order to make connections in new and innovative ways as they progress through social studies education. . . . Students should be aware of the changing cultural and physical environments of Tennessee, the

---

[16] *Plyler v. Doe*, 457 U.S. 202, 221 (1982).

[17] *Tennessee Small Sch. Sys. v. McWherter*, 894 S.W.2d 734, 738 (Tenn. 1995).

[18] *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

[19] *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

[20] *Id.*

United States, and the world; know and understand the past; read, write, and think deeply; and act in ways that promote the common good."[21]  These standards have won Tennessee praise, with the Fordham Institute declaring in 2021 that the state is one of just five in the nation with "exemplary" Civics and U.S. History standards.[22]

26.     But contrary to these exemplary standards, the Ban stifles the spirit of inquiry and understanding in Tennessee public K-12 classrooms by prohibiting discussion of "concepts" that are inextricable from the history of the State of Tennessee, our nation, and the world.  And the Ban seeks to achieve this goal using language that is both imprecise and destructive of public education's civic purpose.

## I.     The Prohibited Concepts Ban Is Incomprehensible

### A.     The Substance of the Act

27.     The Act is codified in Tenn. Code Ann. § 49-6-1019.  Subparagraph (a) of the Act forbids Tennessee school systems ("local education agencies" or "LEAs") and public charter schools from "includ[ing] or promot[ing]" in a curriculum, or allowing teachers to "use supplemental instructional materials that include or promote," the following fourteen "concepts":

> 1)     One (1) race or sex is inherently superior to another race or sex;
>
> 2)     An individual, by virtue of the individual's race or sex, is inherently privileged, racist, sexist, or oppressive, whether consciously or subconsciously;
>
> 3)     An individual should be discriminated against or receive adverse treatment because of the individual's race or sex;

---

[21] Social Studies Standards at 4.

[22] Jeremy A. Stern et al., *The State of State Standards for Civics and U.S. History in 2021*, Thomas B. Fordham Institute (June 23, 2021), https://fordhaminstitute.org/national/research/state-state-standards-civics-and-us-history-2021.

4)    An individual's moral character is determined by the individual's race or sex;

5)    An individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

6)    An individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex;

7)    A meritocracy is inherently racist or sexist, or designed by a particular race or sex to oppress members of another race or sex;

8)    This state or the United States is fundamentally or irredeemably racist or sexist;

9)    Promoting or advocating the violent overthrow of the United States government;

10)   Promoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people;

11)   Ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex;

12)   The rule of law does not exist, but instead is a series of power relationships and struggles among racial or other groups;

13)   All Americans are not created equal and are not endowed by their Creator with certain unalienable rights, including, life, liberty, and the pursuit of happiness; or

14)   Governments should deny to any person within the government's jurisdiction the equal protection of the law.

28.   Section 49-6-1019(b) of the Act purports to limit the reach of subsection (a) by providing that the prohibition does not apply to materials regarding "(1) The history of an ethnic group as described in [state approved textbooks and instructional materials]; (2) The impartial discussion of controversial aspects of history; (3) The impartial instruction on the historical oppression of a particular group of people based on race, ethnicity, class, nationality, religion or

geographic region; or (4) Historical documents relevant to subdivisions (b)(1)–(3) that are permitted under § 49-6-1011." [23]

29.      In subsection (c), the Act provides that, if the Commissioner of the DOE finds that a school has "knowingly" violated the Act's terms, the Commissioner "shall withhold state funds, in an amount determined by the commissioner, from the LEA or public charter school until the LEA or public charter school provides evidence to the commissioner that the LEA or public charter school is no longer in violation of this section."[24]

30.      The Act does not define any of its terms.

**B.      The Subsequent DOE Rules**

31.      On May 8, 2022, the DOE promulgated the rules currently codified in Tenn. Comp. R. & Regs. 0520-12-04 (the "Rules").  The Rules went into effect on August 10, 2022.

32.      In § 0520-12-04-.02, the Rules define certain terms used in the Act and Rules. Among other definitions, some of which are discussed in more detail below, the Rules collectively identify the fourteen concepts listed in subparagraph (a) of the Act as "Prohibited Concepts."

33.      In § 0520-12-04-.03, the Rules declare: "The following concepts are Prohibited Concepts that shall not be included or promoted in a course of instruction, curriculum and instructional program, or in supplemental instructional materials."[25]  This section of the Rules incorporates the fourteen "prohibited concepts" and purported safe harbor provisions identified in the Act.

---

[23] Tenn. Code Ann. § 49-6-1019(b)(1)−(4).

[24] *Id.* § 49-6-1019(c).

[25] Tenn. Comp. R. & Regs. § 0520-12-04-.03(1).

34.     In § 0520-12-04-.04 to -.08, the Rules provide an enforcement mechanism and set forth the consequences of noncompliance.  The Rules authorize parents, students, and public and charter school employees — collectively, "eligible complainants"[26] — to file complaints "alleging that Prohibited Concepts are being or have been included or promoted in a course of instruction, curriculum and instructional program, or in supplemental instructional materials . . . ."[27]  The Rules require that a complaint "shall . . . include[] . . . [i]f known, the name of the individual alleged to have included or promoted the Prohibited Concept."[28]  The Rules direct that the LEA or public charter school "shall . . . investigat[e]" the allegations,[29] and, within 60 days, "shall determine whether the allegation(s) in the complaint is [sic] substantiated,"[30] which it must "communicate[] to the complainant and the individual alleged to have included or promoted the Prohibited Concept."[31]

35.     The Rules' penalty provision instructs that, "[i]f an alleged violation is substantiated, the LEA or public charter school shall take appropriate remedial action. . . .  Such remedial action may include: . . . Disciplinary action against a teacher for violation of [the Act] in accordance with Tennessee State Board of Education rule 0520-02-03-.09" or "[a]mendment of the course of instruction, curriculum and instructional program, or supplemental instructional materials."[32]

---

[26] *Id.* § 0520-12-04-.02(6).

[27] *Id.* § 0520-12-04-.05(2).

[28] *Id.* § 0520-12-04-.05(5)(d).

[29] *Id.* § 0520-12-04-.04(1)(a).

[30] *Id.* § 0520-12-04-.05(8).

[31] *Id.* § 0520-12-04-.05(9).

[32] *Id.* § 0520-12-04-.05(10).

36.     Rule 0520-02-03-.09, referenced in the Rules' penalty provision, authorizes the SBOE to take disciplinary action against a teacher ranging from a reprimand to suspension or revocation of the teacher's license.  According to subsection (9) of this rule, a teacher whose license has been suspended or revoked "shall not serve as a school volunteer or be employed, directly or indirectly, as an educator, paraprofessional, aide, substitute teacher, or in any other position in a school during the period of the suspension or revocation."[33]  Revocation of a teacher's license, authorized in the penalty provision of the Rules, effectively ends the teacher's career as an educator.

37.     The Rules instruct that a violation may be established against a "complained of individual" for "affirmatively and intentionally includ[ing] or promot[ing] the concept at issue."[34]

38.     The Rules also provide that either party may appeal the decision of the LEA or charter school to the DOE, and that any remedial action taken by the LEA or charter school is stayed for 15 days to permit such an appeal.[35]

**C.      The Ban Is Unconstitutionally Vague on Its Face**

39.     Because the Ban is ambiguous and confusing, it threatens the livelihoods of thousands of Tennessee public school teachers for simply doing their jobs, and it inhibits classroom instruction and discussion of topics required by the BOE's statewide standards.  The Ban fails to provide Tennessee educators a reasonable opportunity to understand what conduct the Ban prohibits, and it allows for arbitrary and discriminatory enforcement.

---

[33] *Id.* § 0520-02-03-.09(9).

[34] *Id.* § 0520-12-04-.05(8).

[35] *Id*. § 0520-12-04-.05(10).

### 1. The Ban's Central Prohibition

40.     The Ban's central prohibition, found in § 49-6-1019(a) of the Act and § 0520-12-04-.03(1) of the Rules, provides constitutionally insufficient guidance to educators and no way to distinguish between culpable and non-culpable speech and conduct.

41.     The word "promote" is susceptible to multiple and wide-ranging meanings, and nothing about the context surrounding the word "promote" in the Ban limits or clarifies the meaning of that vague term.

42.     The only other term describing the conduct prohibited by the Ban is "include," which the Oxford English Dictionary defines to mean "to involve [or] imply."[36]  The term "include" illustrates that the Ban has no meaningful outer boundary, sweeping within its scope *any* reference, even by implication, to *any* of the fourteen concepts identified in the statute, for *any* purpose — even, for example, where a "prohibited concept" is "include[d]" so that it may be refuted or rejected.  The word "include" confuses rather than clarifies the meaning of the Ban because its breadth renders the term "promote" superfluous.

43.     The Ban applies to any speech, activity or printed matter that exists or occurs in Tennessee public school classrooms, including textbooks; all supplemental materials used in the classroom; unrehearsed curricular speech of individual Tennessee educators; and the speech of Tennessee public school students, whether through comments made in class or questions posed to teachers.  If a student in Plaintiff McIntosh's Contemporary Issues class asked a question about discrimination, for example, the Ban could be understood to prohibit Ms. McIntosh from

---

[36] *Include,* OED.com, https://www.oed.com/dictionary/include_v?tab=meaning_and_use#795161 (last visited July 21, 2023).

answering the question despite its clear relevance to various contemporary issues and current events. The Ban's penalty provision is directed expressly at teachers.[37]

44.     Educators may violate the Ban notwithstanding their good faith belief that their words, actions, or the materials they are using do not violate the Ban. Educators are liable for the "inclu[sion] or promot[ion]" of a prohibited concept by any means — through their own speech, the speech of their students, textbooks and supplemental materials — so long as they acted "affirmatively and intentionally."[38]

45.     "Affirmatively" is not typically used to describe a legally culpable mental state, and its meaning is unclear in the context of the Ban. At most, it means "[b]y way of assertion or express declaration; assertively, expressly; emphatically," and in that sense it is subsumed within its neighboring term, "intentionally."[39] "Intentionally" describes acts that are voluntary, rather than coerced, and not accidental or inadvertent. But an educator's on-the-job speech and conduct will *always* be "affirmative[] and intentional[]." A teacher cannot inadvertently teach a lesson, respond to a student's question, or use a textbook, and therefore the phrase "affirmative[] and intentional[]" fails to separate culpable from non-culpable conduct, and fails to provide educators with adequate notice of the conduct prohibited by the Ban.

46.     As a result, an educator may be found liable under the Ban in the absence of any warning that the educator's speech or conduct might violate the Ban, or any showing that the educator knew or should have known that his or her speech or actions ran afoul of the Ban. Complaints against individual educators may be considered "substantiated" under the Ban, even

---

[37] *Id.* § 0520-12-04-.05(10)(b).

[38] *Id.* § 0520-12-04-.05(8)(b).

[39] *Affirmatively*, OED.com, https://www.oed.com/dictionary/affirmatively_adv?tab=meaning_and_use#9103835 (last visited July 21, 2023).

where the educator did not know that the challenged comment, question, lesson, textbook, or supplemental material implicated, much less violated, the Ban.

### 2. The Listed Prohibited Concepts

47. Several of the identified "prohibited concepts" are also unconstitutionally vague, incoherent, and provide constitutionally insufficient guidance to Tennessee educators hoping to conform their conduct to the Ban.

48. For example, "prohibited concepts" (9) through (11) all begin with gerunds that make it impossible to discern what the Ban intends to prohibit. With respect to prohibited concept (9), for example, the Ban instructs that Tennessee public school educators "shall not include or promote the . . . concept[]" of "promoting or advocating the violent overthrow of the United States government."[40] Prohibited concepts (10) and (11) employ the same construction to prohibit the "inclu[sion] or promot[ion]" of "[p]romoting . . ." and "ascribing . . .", respectively.[41] Tennessee educators can do little more than guess at the meaning of these proscriptions.

49. Prohibited concept (10) prohibits materials, lessons, and speech that "include or promote . . . promoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people."[42] But the Act fails to define the phrases "division between" and "resentment of," and the focus of these phrases is entirely, and impermissibly, on the subjective reaction of listeners, not on the conduct of educators. The very same speech or conduct may be perceived as "divisive" by, or give rise to feelings of "resentment" in, some parents and students, and have no such effect on others. Accordingly, this provision does

---

[40] Tenn. Code Ann. § 49-6-1019(a)(9).

[41] *Id.* § 49-6-1019(a)(10)−(11).

[42] *Id.* § 49-6-1019(a)(10).

little more than forbid Tennessee educators from offending their students, or their students' parents. As such, the Ban fails to specify any standard of conduct, and educators are left to guess at its meaning.

### 3. The SBOE's Statewide Educational Standards

50. The SBOE standards identify what students in each grade "should know [and] understand" by the end of each grade. The standards therefore establish what Tennessee public school teachers must teach to their students, even if the standards "do not dictate curriculum," which is left to individual LEAs and public charter schools.[43]

51. For example, the Fourth Grade standards concerning the "United States Prior [to] the Civil War (1820s-1861)" direct that Tennessee public school students "know and understand": "the sectional differences between the North and the Antebellum South," including economic, political, population, and social differences; "abolitionist leaders and their approaches to ending slavery, including" Frederick Douglass, William Lloyd Garrison, Sojourner Truth, and Harriet Tubman; "how slavery became a national issue during the mid-19th century, including the significance of" the Missouri Compromise, the Compromise of 1850, *Uncle Tom's Cabin*, Kansas-Nebraska Act, *Dred Scott v. Sandford*, and John Brown's Raid on Harper's Ferry; and "the various sectional stances on states' rights and slavery represented by the presidential candidates in the election of 1860, including Abraham Lincoln and Stephen A. Douglass."[44] Tennessee's public school educators cannot teach these subjects without "includ[ing]" the concepts identified in subsections (a)(1), (2), (3), (4), (5), (7), (8), (11), (13) and (14) of the Act, and subsections (1)(a),

---

[43] Social Studies Standards at 1; *see also* Tennessee Department of Education, Academic Standards, https://www.tn.gov/education/districts/academic-standards.html (last visited July 21, 2023) ("Districts should locally establish curricular programs that support student mastery of the Tennessee Academic Standards while reflecting unique community values.").

[44] Social Studies Standards at 59.

(b), (c), (d), (e), (g), (h), (k), (m), and (n) of the Rules. Each of those "prohibited concepts" animated in one way or another the historical actors and episodes that Tennessee's standards require teachers to discuss with their students.

52. As Tennessee public school students progress, the standards require teachers to ensure that students "know [about] and understand" other difficult historical episodes that implicate many of the prohibited concepts, including lessons about: the Holocaust;[45] "how the rise of vigilante justice (e.g., Ku Klux Klan), black codes and Jim Crow laws impacted Tennessee and the nation;[46] "the caste system" in India;[47] "the origins and development of slavery in the colonies;"[48] "the conditions of enslavement, and . . . how slaves adapted to and resisted bondage in their daily lives, including Nat Turner's revolt;"[49] "the development of the women's suffrage movement;"[50] "the impact of the Indian Removal Act and the struggle between the Cherokee Nation and the U.S. government, including . . . the Trail of Tears;"[51] "the restrictions placed on the rights and opportunities of freedmen, including: racial segregation, black codes, and the efforts of the Freedmen's Bureau to address the problems confronting newly freed slaves;"[52] and "the rise of the Ku Klux Klan and vigilante justice in the South and in Tennessee."[53] In the high school African American History course, Tennessee public school educators must make sure that students

---

[45] *Id.* at 67.

[46] *Id.* at 72.

[47] *Id.* at 82.

[48] *Id.* at 105.

[49] *Id.* at 109.

[50] *Id.* at 110.

[51] *Id.* at 111.

[52] *Id.* at 115.

[53] *Id.*

"know and understand" African American history from pre-1619 to the present, including each of the topics identified in 52 individual standards.[54] In World History and Geography, students must "know and understand" "the persecution of Jews and other targeted groups in Europe leading up to World War II," and "the state-sponsored mass murder of the Jews in Nazi-controlled lands." [55] Other high school courses require students to "know and understand" the caste system in India and the Apartheid in South Africa;[56] "the causes and consequences of terrorism and international efforts to counteract it;"[57] and "the impact of the September 11, 2001 terrorist attacks."[58]

53.     It is impossible for local school boards to adopt curricula to address the standards, and for Tennessee public educators to teach those curricula, without "includ[ing] or promot[ing]" the prohibited concepts identified in the Ban.

54.     This places Tennessee public school teachers in the untenable position of needing to teach to the SBOE's standards while adhering to the vague prohibitions in the Ban, putting those teachers in imminent risk of being the subject of an enforcement proceeding under the Ban, with the potential for losing their jobs, their teaching licenses, and their livelihoods, not to mention their reputations and the time and expense of defending an enforcement proceeding.

### 4.     The Ban's Safe Harbor Provisions

55.     The safe harbor provisions, found in subparagraph (b) of the Act and subparagraph -.03(2) of the Rules, increase rather than mitigate the Ban's unconstitutional vagueness, and allow for subjective and discriminatory enforcement against Tennessee educators even where an

---

[54] *Id.* at 116–26.

[55] *Id.* at 240.

[56] *Id.* at 132, 242.

[57] *Id.* at 244.

[58] *Id.* at 218.

educator's conduct is consistent with, and compelled by, the statewide standards imposed by the SBOE.

56. Paragraph (b)(2) of the Act and -.03(2)(b) of the Rules (the "Impartiality Clause") purport to permit "[t]he impartial discussion of controversial aspects of history," "notwithstanding" the broad ban found in subparagraph (a) of the Act and -.03(1) of the Rules.[59] But the words "impartial" and "controversial" are not defined in the Act, are highly subjective, and impart those charged with enforcing the Ban with unbridled discretion. The Impartiality Clause provides no guidance to Tennessee educators wary of encroaching on the Ban's broad proscriptions.

57. The fatal vagueness of the Impartiality Clause was made apparent during the brief debates in committee and on the House floor prior to passage of the Act. In response to a question from Representative Antonio Parkinson, Representative John Ragan, the Act's sponsor and presumed drafter, asserted that the term "impartial" as used in subparagraph (b)(2) "means without favor to one side or another, you may use the term 'balanced' if you choose."[60] But Rep. Ragan's efforts in committee and on the House floor to apply that term as he understood it highlight the Act's unconstitutional vagueness.

58. When Rep. Parkinson asked, "when the history of 9/11 is taught . . . how do they teach that impartially," Rep. Ragan first claimed not to understand the question. Then he assumed that 9/11 is a "controversial aspect of history" and therefore within the ambit of subparagraph (b)(2), and he suggested that a Tennessee educator could teach 9/11 "impartially" by teaching

---

[59] Tenn. Code Ann. § 49-6-1019(b)(2); Tenn. Comp. R. & Regs. § 0520-12-04-.03(2)(b).

[60] Tennessee General Assembly, *HB0580*, House Education Administration Committee (May 3, 2021), https://tnga.granicus.com/player/clip/24828?view_id=610&meta_id=607792&redirect=true&h=ddcbfd6e7ad3069e551a5207b4c59cad (hereinafter "HB0580 Debate").

students that "all human beings as being created in the image and likeness of God.  Those who flew those planes were as well."  When Rep. Parkinson asked, "[h]ow do we teach th[e Holocaust] impartially," Rep. Ragan again assumed that the Holocaust is a "controversial aspect of history," and he asserted that a teacher could teach it "impartially" by teaching that Nazis, too, were created by God.  Rep. Ragan also mentioned that a teacher might teach students about the Holocaust "impartially" by mentioning that "not only were up to 6 million Jews slaughtered in the Holocaust, but an equal number of Poles, or residents of Poland, were as well."

59.     During debate before the full House, Rep. Parkinson asked Rep. Ragan how Tennessee public school educators might impartially teach students about Adolph Hitler's involvement in the Holocaust.  Rep. Ragan again assumed that the Holocaust is a "controversial" aspect of history, and he suggested that "[t]he impartiality is, Adolph Hitler was elected chancellor of Germany and later assumed supreme leadership of that country, led it into World War II and ordered the Holocaust.  Those are facts.  Those are impartial.  There is no discussion on advocacy beyond that."[61]

60.     The three remaining "safe harbor" provisions in subparagraphs (b) of the Act and -.03(2) of the Rules are equally imprecise.

61.     Subparagraph (b)(3)/(2)(c) purports to permit the "impartial instruction on the historical oppression of a particular group of people based on race, ethnicity, class, nationality, religion, or geographic region."  The inherent vagueness and subjectivity of the term "impartial" — discussed above — is even less comprehensible in this provision, where it modifies "instruction on the historical oppression" of people based on their membership in certain classes.  The Oxford

---

[61] Tennessee General Assembly, *House Floor Session – 5/4/2021 Message Calendar*, House Floor Session (May 4, 2021), https://tnga.granicus.com/player/clip/24837?view_id=610&redirect=true&h=0161237c74275f42ca7d7cf635ff8e17 (hereinafter "House Floor Debate").

English Dictionary defines "oppression" as the "[p]rolonged cruel or unjust treatment or exercise of authority, control, or power; tyranny; exploitation."[62]  The Ban provides no guidance to educators tasked with teaching about the "prolonged cruel or unjust treatment" of people based on their status "impartially," that is, "without favor to one side or another."

62.     Subparagraph (b)(1)/(2)(a) purports to allow educators to include "[t]he history of an ethnic group, as described in textbooks and instructional materials adopted in accordance with [Tennessee law]."  At most, this provision can be understood to offer safe harbor to state officials who adopt textbooks and instructional materials in accordance with state law.  It offers no guidance to teachers who are tasked with explaining, discussing, and analyzing the information in those textbooks in the classroom consistent with the Ban.

63.     Subparagraph (b)(4)/(2)(d) permits the use of "[h]istorical documents relevant to subdivisions (b)(1)–(3) [of the Act and -.03(2)(a)–(c) of the Rule] that are permitted under § 49-6-1011."  Tenn. Code Ann. § 49-6-1011 contains a list of primary sources that include the state and federal constitutions; the Declaration of Independence; "writings, speeches, documents and proclamations of the founders or presidents of the United States or the founders or governors of this state;" and "[o]pinions of the United States and Tennessee supreme courts," among others.  As with (b)(1)/(2)(a), this provision at most purports to protect the use of these primary sources, but not the explanation, discussion, and analysis of those documents.  So, for example, although this provision might protect a teacher who gives each of her students a copy of the *Dred Scott* decision, it provides no guidance or protection for teachers who discuss the opinion's holding that emancipated slaves were "considered as a subordinate and inferior class of beings, who had been

---

[62] *Oppression,* OED.com, https://www.oed.com/dictionary/oppression_n?tab=meaning_and_use#33201981 (last visited July 21, 2023).

subjugated by the dominant race, and, whether emancipated or not, yet remained subject to their authority, and had no rights or privileges but such as those who held the power and the Government might choose to grant them."[63]

**********

64.     In short, far from a "safe harbor," the provisions of subparagraph (b) of the Act and subparagraph -.03(2) of the Rule are on their face fraught with danger for Tennessee's public school educators.  Any historical episode that touches on race, sex, gender, politics, religion, or class (among other subjects) will be perceived by some as "controversial," which creates a serious threat to Tennessee's public school educators, who could be subject to an enforcement proceeding for simply teaching to the SBOE's statewide standards.  Subparagraph (b) of the Act and -.03(2) of the Rules serve only to add confusion and enhance the risk to Tennessee's public school educators.

### 5.  The Ban's Enforcement Mechanism

65.     The already fatal vagueness of the statute described above is exacerbated by the Rule's enforcement mechanism in §§ 0520-12-04-.02(6), and -.05(2)-(3).  Those provisions provide that a Tennessee public K-12 educator may be subjected to an investigation, without the aid of counsel, and with his or her job and teaching license on the line, based on a complaint made by "a current student," a "parent of a current student," or a "current employee of the LEA or public charter school in which the allegation(s) arose."[64]  Because the universe of "eligible complainants" is not restricted to state officials, there is a substantial risk that educators will be subject to

---

[63] *Dred Scott v. Sandford*, 60 U.S. 393, 404–05 (1857).

[64] Tenn. Comp. R. & Regs. §§ 0520-12-04-.02(6), 0520-12-04-.05(2)-(3).

complaints from parents and students seeking to embarrass a teacher, get revenge for perceived poor treatment, make a political point, or for some other improper reason.

## II.    The Ban Threatens Teachers' Ability to Function in the Classroom

66.    The Ban has had far-reaching effects across Tennessee's public schools.  As described below, it is also unconstitutional as applied.

### A.    The Initial Enforcement Action under the Ban Communicated the Threat to All Tennessee Public School Educators

67.    Terri Bradshaw was one of the first Tennessee public school teachers subjected to an enforcement proceeding under the Ban, and her experience demonstrates the harm that even an unsuccessful enforcement action brought under the Ban can cause Tennessee public school teachers.  Before Ms. Bradshaw was ultimately vindicated, she was required to expend her valuable time beyond normal working hours to defend herself in a months-long proceeding.  The proceeding was publicized across the State of Tennessee.  As a result, Ms. Bradshaw suffered reputational harm, including disparaging social media posts, all for providing instruction on a book that was approved by the DOE and adopted by the district as part of its curriculum.

68.    At the time the Ban went into effect, Ms. Bradshaw was a teacher in Blount County with 45 years of teaching experience in Tennessee public schools.  During the 2021-2022 academic school year, Ms. Bradshaw was serving as a curricular instructor in Blount County, which involved working with teachers across the county to ensure that they understood the state education standards and had effective strategies for teaching the modules described in the state-approved curriculum.

69.    One of the books in the sixth-grade curriculum during the 2021-2022 school year was *Dragonwings*, a Newberry Medal-winning novel by Lawrence Yep, originally published in 1975.  *Dragonwings* is narrated from the perspective of a nine-year-old boy named Moon Shadow

who immigrated from China to San Francisco in the early 1900s. The book addresses the challenges, including racial prejudice, faced by immigrants to the United States. The novel was part of a curriculum called "Wiley Paths to College and Careers," which was approved by the DOE and SBOE and adopted by the Blount County School District for the 2021-2022 school year.

70.     In Ms. Bradshaw's role as curricular instructor, she reviewed with teachers in her district effective strategies for teaching the novel. Among other topics, Ms. Bradshaw provided guidance to the district's teachers for discussing the phrase "white demons" with students. That phrase is used at times in the novel to refer to white Americans. Ms. Bradshaw advised that teachers should discuss the novel as a whole, should not focus on isolated words and phrases taken out of context, and should explain to students the cultural context of the term "demons" — in particular, that the term would not have had the same derogatory connotation in the characters' native Chinese culture as it has in American culture.

71.     Ms. Bradshaw also reviewed with the teachers in her district the alternate independent study material that would be provided by the teacher to any student whose parents objected to *Dragonwings* and requested an alternate assignment. Ms. Bradshaw ensured that the teachers in the district were aware that it was standard practice in the state to make alternative curricular options available and that an alternative was in fact available with respect to the *Dragonwings* module.

72.     In February 2022, a parent of a student at Union Grove Middle School in Blount County filed a formal three-page Prohibited Concepts Complaint Form with the district, asserting that *Dragonwings* implicated the "prohibited concepts" identified in subparagraphs (a)(4), (7), (10) and (11) of the Act. In the complaint, the parent focused on the use of the phrase "white demons" in the novel and his view that the novel promoted "racism and [an] anti-American agenda" that is

"not appropriate for any age." The parent further asserted that his daughter "had to write that 'Americans are rude and not to be trusted'" as the "correct answer to a question" in class. The parent acknowledged that "[t]he argument might be made that this book reflected the mindset of an immigrant child in 1903," but he rejected that as an explanation for the language in the novel because the author was "born in California" and "could have addressed the injustice at the turn of the century without referring to Americans as demons hundreds of times." The parent asserted that the author instead "chose to make his words divisive."

73.     At a meeting of the Blount County School Board in February 2022, the parent and others called for *Dragonwings* to be removed from the curriculum districtwide. One speaker urged the board to pass a resolution in opposition to the "toxic ideology" of critical race theory and cited the Ban. She said, "Given that there is a state law prohibiting these concepts from the curriculum, wouldn't you want to demonstrate that Blount County Schools takes this seriously?"[65]

74.     Although Ms. Bradshaw did not select *Dragonwings* for the Blount County curriculum, was not responsible for teaching it to students in the classroom, and in fact advised teachers about the existence of an alternative that could be used in place of *Dragonwings* if a parent requested it, the parent named Ms. Bradshaw and two of her supervisors as the individuals who allegedly "included or promoted" the prohibited concepts in violation of the Ban.

---

[65] Amy Beth Miller, *Blount County Board of Education asked to remove "Dragonwings" book*, The Daily Times (Feb. 3, 2022), https://www.thedailytimes.com/news/blount-county-board-of-education-asked-to-remove-dragonwings-book/article_cad287ca-b339-527a-bc24-8fb50eeb3405.html (last visited July 21, 2023).

75. As a result of the parent's complaint, Ms. Bradshaw was embroiled in a months-long administrative process without access to a lawyer, on pain of discipline, termination, or loss of her professional license, and a reduction in funding for Blount County schools.[66]

76. The administrative process began at the school district level, where the Blount County Director of Schools undertook an investigation of the complainant's allegations.[67] The Director made eight pages of findings related to the allegations and concluded that they were not substantiated.[68] The Director found, among other things, that:

> *[I]n cultural context*, referring to a demon can have a positive or negative connotation. In Chinese culture, the term refers to a being with supernatural powers, which can be used for good or evil. Demons were characters from mythology and folklore, rather than religious entities as would be expected in a text written from a western perspective. The Merriam-Webster definition of the word demon [cited by the complainant] does not apply to how the word is used by Moon Shadow, a fictional character who is an eight-year-old child and whose cultural background is Chinese. This perspective is formed before he has had any actual exposure to any Americans or a white person of any kind. . . .
>
> [T]he major thematic point of the novel, and why it coincides with a unit on understanding the character's perspective, is the arc of change in Moon Shadow's perspective. He moves from mistrust and doubt, based on what he had heard and learned from his family as he grew up in China, to understanding and appreciation, based on his *actual lived experience* with specific American characters.
>
> All teachers were provided with this contextual background information in order to assist them in preparing students for reading the novel. . . . If students are taught to understand the nuances specific to the use of the word demon in cultural context and they are guided through a progression of the character's perspective, they have the foundation to understand that this does not constitute a specific disparagement of a race or people but rather an examination

---

[66] Ms. Bradshaw asked for access to a lawyer paid for by the district to assist her with her response to the allegations, but she was not provided with one.

[67] *See* Tenn. Comp. R. & Regs § 0520-12-04-.05.

[68] *See id.* § 0520-12-04-.05(8).

> of a character's change over time based on learning and experience.
> Moon Shadow progresses from an uninformed perception to an
> emerging understanding of people who are different from him.
>
> Furthermore, the novel contains counter-examples of white
> American characters who are portrayed in a positive light.

At the conclusion of the district's investigation, the Director informed the parent in a three-page letter dated April 22, 2022, that his claims were not substantiated.

77.     The parent appealed the decision to the DOE.  In this appeal process, Ms. Bradshaw and her colleagues prepared and submitted nearly 250 pages of material, including a detailed timeline of the relevant events and a summary of the district's findings.  The materials included extensive citations to passages in *Dragonwings* that Ms. Bradshaw herself compiled.  Ms. Bradshaw and the sixth-grade teacher who taught *Dragonwings* to the complainant's child were both interviewed.

78.     Ms. Bradshaw estimates that, during the proceeding at the district and state levels, she devoted more than 40 hours outside of her normal working hours to reviewing materials, preparing responses to the complainant's allegations, and preparing for her interview by representatives from the DOE Commissioner's office.

79.     On June 10, 2022, the DOE review team issued its report and recommendation about *Dragonwings* to then-DOE Commissioner Penny Schwinn.  The team recommended the Commissioner find that the novel did not violate the Ban, and it explained:

> Novels are taught as a whole, not as a series of isolated quotations;
> when considered holistically, *Dragonwings* promotes an optimistic
> view of the characters' ability to change perspectives and to build
> relationships across racial and cultural differences.  These big ideas
> of the novel are communicated so clearly that we believe a child
> reading the book alone, without a teacher's guidance, would be able
> to glean this message and, even more so, a child guided by the *Paths
> to College and Careers*/EL teaching and tasks when they are
> followed with integrity.

80.     Commissioner Schwinn issued her findings in a letter to the Director of Blount County Schools on June 22, 2022, and found that the complaint was unsubstantiated.

81.     Notwithstanding Ms. Bradshaw's eventual vindication at the district and state levels, Blount County Schools removed *Dragonwings* from its sixth-grade curriculum districtwide in February 2022, shortly after the complaint was filed and before the district or state completed its investigation.  Many sixth-grade students at the school were in the middle of the book when the school determined that it would no longer be taught.[69]

82.     Ms. Bradshaw also suffered tangible harm from having to defend against the enforcement action under the Ban, during which her teaching license was at risk, by expending more than 40 hours of her time beyond normal working hours, and suffering reputational harm due to the publicity surrounding the enforcement action.  The controversy over *Dragonwings* was covered widely by the press in Tennessee and beyond, as was the removal of *Dragonwings* from Union Grove's curriculum following the parent's complaint.  Although Ms. Bradshaw was not responsible for selecting *Dragonwings* or teaching it to students, and in fact advised Union Grove teachers that an alternative was available if a parent requested it, she was nevertheless named in the complaint, identified in various hostile social media posts concerning the book and the complaint, and entangled in months of administrative proceedings without a lawyer.

83.     Public school teachers across Tennessee face the imminent threat that they too could be subject at any time to an enforcement action of this kind, brought by a parent or student who believes that a teacher's conduct violates the Ban.  The prohibitions in the Ban are so vague

---

[69] Grace King, *Blount County middle school removes book 'Dragonwings' from curriculum after parents express concerns*, 10 News (Feb. 14, 2022), https://www.wbir.com/article/news/education/blount-county-middle-school-removes-dragonwings-from-curriculum-after-parents-express-concerns/51-6c40df29-2a72-43dd-b5ca-93baa3083dcc.

that teachers cannot conform their conduct in the classroom to adequately protect themselves from an enforcement action, which brings with it not only the harms suffered by Ms. Bradshaw, but also the threat of termination and loss of license.

**B.     The Threat Continues for Teachers Across Tennessee**

84.     Ms. Bradshaw's experience illustrates to teachers across Tennessee that, in the face of the Ban's expansive and vague proscriptions, one parent can put an educator's job, reputation, and career at risk for doing precisely what she was hired to do.  Educators across the state are justified in fearing an enforcement action for any discussion that might cause offense or that arguably implicates race or another "prohibited concept."  That fear comes at the expense of student learning.

85.     For example, because of the Ban's vagueness, Plaintiff Kathryn Vaughn fears that her lessons will violate the Ban and subject her to discipline, including termination and loss of her teaching license.  Throughout her 15 years of teaching, Ms. Vaughn has developed lesson plans, in accordance with the SBOE's standards and her district's curriculum, that incorporate a diverse range of artistic works and artist backgrounds.  Since the Ban, Ms. Vaughn has become worried about presenting her students with artistic works by certain artists whose political views or gender or sexual identities could be understood as implicating the prohibited concepts.  Frida Kahlo is one such artist.  In connection with a lesson about bullying that was approved by her school's administration prior to the Ban and that had received positive feedback from students and parents, Ms. Vaughn has displayed and discussed a painting called The Wounded Deer by Ms. Kahlo.  Ms. Vaughn is now concerned that Ms. Kahlo's political views and sexual identity could implicate the prohibited concepts identified in the Ban.  Ms. Vaughn also is afraid and unsure whether teaching students about the artist Keith Haring will expose her to liability under the Ban because of his political activism and advocacy for victims of the AIDS epidemic.  Even though Ms. Vaughn does

32

not discuss the political views or sexual identities of any of the artists she teaches, she remains concerned about potential liability given the law's vagueness. After the law's passage, Ms. Vaughn removed all the books from her classroom library for the same reason.

86. Ms. Vaughn is also concerned that her lessons concerning certain Asian art, including art related to Chinese New Year, may subject her to discipline because she cannot discern whether those lessons violate the Ban, or even whether making changes to her lessons will avoid violating the Ban. In June 2021 — just after the Prohibited Concepts Ban was signed into law — Ms. Vaughn attended a meeting of the Tipton County Republican Party at the invitation of Tennessee's then-Secretary of State, who planned to discuss voting rights and registration at the meeting. Following the Secretary of State's presentation about voting rights, the focus of the meeting turned to the Ban. During the meeting, a woman in the audience began reading excerpts from a textbook approved by the Tipton County Board of Education related to the Chinese immigrant experience in the United States. The woman disparaged the excerpts as "divisive" and "horrible," and other attendees at the meeting echoed the woman's views. In 2022, Ms. Vaughn became aware through press reports of the controversy over *Dragonwings*, discussed above. Ms. Vaughn's experience at the meeting and the *Dragonwings* controversy, together with the Ban's vagueness, led Ms. Vaughn to fear that her lesson about art related to Chinese New Year would lead to a complaint under the Ban that could jeopardize her public employment and teaching license. Ms. Vaughn is concerned that she may violate the ban by having her students make masks in the style of those worn in Chinese New Year parades and by having a classroom dragon puppet parade, even though her students before the Ban loved the parade, and it had been featured in a local newspaper. She is also concerned that content from her lesson concerning the immigrant experience in the United States may violate the Ban. Because of the vagueness of the Ban, Ms.

Vaughn continues to fear that any lesson that discusses other cultures — an aspect of much of the art she teaches in her classroom — may violate the Ban. Ms. Vaughn worries that continuing to teach lessons that discuss other cultures will trigger an enforcement proceeding that could result in discipline, including termination and loss of her teaching license.

87. The uncertainty and fear Ms. Vaughn has experienced and the changes she made in her classroom are consistent with the kinds of changes that occurred throughout her school after the enactment of the Ban. Although students at her school previously had the option to take field trips to the National Civil Rights Museum in Memphis, where students could sit on a replica of the bus on which Rosa Parks protested, those field trips are no longer offered to students after the law's passage. Instead, students have the option to go to a baseball game. The lack of clarity regarding the scope of the Ban has harmed Ms. Vaughn, who remains fearful of sanctions, and has undermined the quality of education her students receive.

88. In Plaintiff Roland Wilson's role as Choir Director, he does not have a state- or district-approved curriculum he must follow when teaching. Instead, Mr. Wilson has discretion, subject to oversight by his school's administration, to select the musical works his students sing and to teach his students about those works. To ensure his students are exposed to a wide range of music, Mr. Wilson typically selects a diverse array of musical pieces for his students to sing, including works in foreign languages, works written by European artists during the Renaissance, and African American spirituals composed by enslaved people in the antebellum South ("Spirituals"). Mr. Wilson has included at least one Spiritual in his class's repertoire every year for all 22 years he has taught choir in Tennessee public schools, and he understands that other choir directors throughout the state teach a similar array of works and often include Spirituals in

34

their class repertoire.  To maximize Mr. Wilson's students' engagement with and appreciation of the music, he also discusses with his students the historical context in which the music was written.

89.     Mr. Wilson has received positive feedback from students and parents about this approach, particularly with respect to the Spirituals he teaches.  Since the Ban was enacted, however, Mr. Wilson is concerned that he could inadvertently violate the Ban when having these discussions about historical context.  Discussing the historical context of Spirituals necessarily involves discussing the brutality of slavery and enslaved peoples' efforts to obtain freedom from white enslavers.  Some of the most well-known African American Spirituals contain coded messages that enslaved people used to exchange information about the Underground Railroad.  Mr. Wilson fears that if a student were to feel guilty or uncomfortable during discussions about these facts and a parent were to complain, he could face sanctions under the Ban, including termination and loss of his teaching license.

90.     In the 2023-2024 school year, Mr. Wilson will again serve as Choir Director at Central High.  He will again include at least one Spiritual in his class repertoire, as he has for the past 22 years.  The Spiritual he selects for his class will depend in part on the skills and interests of the students he is assigned to teach in the upcoming year.  For the Spiritual he selects, he will discuss with his students the meaning and significance of the song, including the brutality of slavery and enslaved peoples' efforts to obtain freedom from white enslavers.  He fears that these discussions may subject him to an enforcement action under the Ban.

91.     Plaintiff Michael Stein also fears inadvertently violating the Ban.  In the 2022-2023 school year, Mr. Stein used a DOE- and district-approved textbook called *StudySync* to teach his twelfth-grade English course.  The textbook begins with a unit on "changing the future," during which students read excerpts of the Supreme Court's 1896 opinion in *Plessy v. Ferguson*.  In

*Plessy*, the Supreme Court held that racial segregation was constitutional. Even though the excerpts from *Plessy* appear in the state-approved textbook for the course, Mr. Stein fears that assigning his students to read the excerpts, and thereafter discussing the case and segregation with them, may violate the Ban.

92.    Mr. Stein also fears discussing current events with his students out of concern that any discussion of contemporary issues might implicate one or more of the "prohibited concepts," or be perceived as "divisive" and therefore in violation of the Ban. When teaching the novel *1984* by George Orwell, Mr. Stein fears that asking students to think about how the novel's themes apply in the world today may violate the Ban, even though the novel is considered by many to involve timeless lessons about the role of government in citizens' lives. For similar reasons, Mr. Stein also fears that he may violate the Ban by giving students the weekly assignment from his lesson plans called Article of the Week, in which students are instructed to read an article about a current event, write a short summary and critique of it, and then discuss the article as a class. Article of the Week encourages students to think critically and to practice listening and respectfully debating other students who disagree with them. Mr. Stein fears that this assignment may violate the Ban in light of the Ban's unclear scope.

93.    Mr. Stein also fears that he may inadvertently violate the Ban when teaching English as a Second Language ("ESL"). There is no state- or district-approved curriculum for ESL in the State of Tennessee. Accordingly, ESL teachers like Mr. Stein are required to create their own curriculum tailored to the needs and reading abilities of their students. Mr. Stein assigns advanced ESL students young adult novels to read, and he believes his students learn best when he can assign age appropriate but still challenging novels that his students are interested in reading. Many such young adult novels address issues of race and gender, which are of interest to high

36

school students. Because the Ban is vague, Mr. Stein cannot determine whether the young adult novels that he has historically assigned to his advanced ESL students, including award-winning and best-selling novels *The House on Mango Street* by Sandra Cisneros and *Refugee* by Alan Gratz, violate the Ban.

94. Plaintiff Rebecca Dickenson fears that a book in her library or a lesson that she teaches may violate the Ban, including because it is perceived by a complainant to "promote division" as described in § 49-6-1019(10). As a part of her duties as librarian at Eagleton Elementary, Ms. Dickenson meets with each class at the school once a week for approximately 40 minutes. Ms. Dickenson often reads stories aloud to her younger students during these periods. For example, she has read and will continue to read to her younger students picture books including *Rosa*, about Rosa Parks and the Civil Rights movement, but she fears that those books may be perceived as "promoting division" because of sensitivities about race in the community in which she teaches.

95. Ms. Dickenson often assigns research projects to her older students, and she fears that those assignments may also violate the Ban. For example, Ms. Dickenson has in past years assigned her students to conduct research about a secular or religious holiday and prepare a slideshow about the holiday to present to the class, and she intends to assign that project to students in the future. Because the Ban does not adequately identify the conduct that it prohibits, Ms. Dickenson fears that assigning a student to research a non-Christian holiday will be perceived as "promoting division" in violation of the Ban because a complainant might perceive the assignment to promote one religion or its ideals over another. Ms. Dickenson also fears that research assignments that concern biographies of Martin Luther King, Jr., and other civil rights leaders, including *Memphis, Martin, and the Mountaintop* by Alice Faye Duncan and R. Gregory Christie,

will similarly be perceived as "promoting division" in violation of the Ban. Because the Ban incorporates the subjective views of a complainant, Ms. Dickenson is not able to determine which books or lessons may violate the Ban.

96. Ms. Dickenson is aware that parents, students, and other school employees may file complaints against educators for allegedly violating the Ban, and this heightens her concerns about being subjected to an enforcement action given the increased hostility towards teachers in her school district. For example, as the president of the local TEA chapter, Ms. Dickenson attends monthly school board meetings to solicit input from the community. Since the passage of the Ban, and especially since the *Dragonwings* controversy described above, there have been complaints at every meeting about books and the school curriculum, often coupled with *ad hominem* attacks on teachers. At one meeting, a parent stood up with their child and claimed erroneously that the child's public school was not teaching students about Abraham Lincoln or George Washington but did teach them about controversial topics involving race and identity. In another meeting, a community member accused teachers and school administrators in Blount County of being "groomers" who are exposing children to sexually explicit materials at school. After information about this exchange was posted to a Facebook account, one user commented "if the shoe fits, wear it," implying that the teachers and school administrators in Blount County were in fact attempting to "groom" children with sexually explicit materials. Ms. Dickenson fears that the vitriol directed at teachers in her community, combined with the subjective and ill-defined prohibitions in the Ban, creates a high risk that she and other K-12 public school educators in Blount County will be subjected to an enforcement proceeding.

97. Plaintiff Mary McIntosh's Facing History and Ourselves and Contemporary Issues classes — both approved by the DOE and taught to high school students — presented similar

concerns.  Facing History and Ourselves uses the lessons of history to challenge bigotry and hate, and Contemporary Issues encourages students to use inquiry skills to examine issues that impact the contemporary world.  Ms. McIntosh believes it was her job as a regular classroom teacher to engage meaningfully with students about the challenging subject matter presented in these courses, and to answer students' questions, so that students could form their own opinions about the issues they discussed in class.  But, because the Ban is vague, Ms. McIntosh did not know what the law permitted her to say and do in these discussions.  As a result, she removed from her lesson plans certain lessons that are part of the national Facing History and Ourselves curriculum because she was concerned they might be construed as implicating the prohibited concepts, notwithstanding the state's approval of that curriculum.  For example, Ms. McIntosh excluded parts of a unit called "We and They," which deals with racial and ethnic discrimination, including the Emmy-award winning documentary "A Class Divided" and parts of the documentary series "Race: The Power of Illusion."  Ms. McIntosh also excluded certain lessons from her Contemporary Issues class, including, for example, a multi-week unit concerning adult novel *Brown Girl Dreaming*.  This uncertainty harmed Ms. McIntosh, who was fearful of sanctions, and her students, who were deprived of the benefit of standards that enable a teacher to understand what he or she is allowed to say and do in the classroom.

98.     In the 2023-2024 school year, Ms. McIntosh expects to serve as a substitute teacher in the Memphis Shelby County Schools ("MSCS").  Ms. McIntosh believes that the Ban creates substantial risks for her as a substitute teacher because she will have less familiarity with the students she is teaching on any given day, less control over the lessons planned for that day, and, in some cases, less familiarity with the subject matter than she had when she was teaching full-time.  In light of these variables and the Ban's vagueness, Ms. McIntosh is concerned that she may

inadvertently violate the Ban while serving as a substitute teacher, triggering an enforcement proceeding that could impose reputational and monetary harm, including the loss of her employment and her teaching license.

## III.    The Unconstitutionality of the Ban Is Plain from Its Legislative History

99.    The Act's vagueness is a product of its dubious origin, hasty passage, and the absence of any evidence to support its broad proscription.

### A.    A Proposed U.S. Department of Education Rule Creates Controversy in Tennessee

100.    The Tennessee General Assembly meets for 90 session days over each two-year period.  Each year, legislative sessions typically last from mid-January through late April or May. The 2021 legislative session convened on January 12, 2021 and adjourned on May 5, 2021.

101.    On April 19, 2021, the U.S. Department of Education ("U.S. DOE") proposed a rule for notice and comment outlining the Department's priorities for American History and Civics Education programs to "support culturally responsive teaching and learning" (the "Proposed Rule").[70]  The Proposed Rule applied only to applicants for certain federal grants that sought to:

incorporate[] teaching and learning practices that –

(a)    Take into account systemic marginalization, biases, inequalities, and discriminatory policy and practice in American history;

(b)    Incorporate racially, ethnically, culturally, and linguistically diverse perspectives and perspectives on the experience of individuals with disabilities;

(c)    Encourage students to critically analyze the diverse perspectives of historical and contemporary media and its impacts;

---

[70] Proposed Priorities — American History and Civics Education, 86 Fed. Reg. 20348 (proposed Apr. 19, 2021), https://www.federalregister.gov/documents/2021/04/19/2021-08068/proposed-priorities-american-history-and-civics-education.

(d)     Support the creation of learning environments that validate and reflect the diversity, identities, and experiences of all students; and

(e)     Contribute to inclusive, supportive, and identity-safe learning environments.[71]

102.    On April 20, 2021, the day after the U.S. DOE released the Proposed Rule, the website of the Tennessee Branch of the Eagle Forum, a national conservative organization,[72] published a column that referenced the Proposed Rule and claimed that "President Biden's Department of Education has signaled its intent to impose the most radical forms of critical race theory on America's schools."[73]  The Eagle Forum's headline was "STOP Critical Race Theory in TN NOW!"[74]

103.    The next day, on April 21, 2021, approximately 100 members of the Republican Party of Williamson County, Tennessee, met to discuss their concerns that "critical race theory" was being taught in Tennessee's public elementary schools.[75]  Among the attendees was a woman who described herself as the mother of a seven-year-old girl who, the woman claimed, was "in therapy," "scared to death[,] and even had thoughts of killing herself" after she "came home from

---

[71] *Id.*

[72] The Eagle Forum describes itself as "the most effective national organization of men and women who share conservative and pro-family values."  The Eagle Forum, https://eagleforum.org (last visited July 21, 2023).

[73] Stanley Kurtz, *Biden Set to Push Critical Race Theory on U.S. Schools*, The National Review (Apr. 19, 2021), https://www.nationalreview.com/corner/biden-set-to-push-critical-race-theory-on-u-s-schools/.

[74] David Waters, *Did New Tennessee Law Negate Critical Race Theory Or Prove It?*, The Institute for Public Service Reporting, University of Memphis (Jun. 14, 2021), https://www.psrmemphis.org/did-new-tennessee-law-negate-critical-race-theory-or-prove-it/.

[75] *Id.*

school one day" and told her mother, "I'm ashamed that I'm White."[76]  The story about the seven-year-old girl was re-posted in the Eagle Forum.[77]

104.    Bobbie Patray, president of the Tennessee Eagle Forum, asserted that the story about the seven-year-old girl mobilized people in Williamson County and elsewhere in Tennessee to call for restrictions on what is taught in Tennessee's public schools.[78]  Patray explained that the story "lit the match" in Tennessee.  She explained that "[i]t's fine to think about what goes on in New York or California or somewhere out there, but this story about a 7-year-old girl brought it home to parents who said, 'That could have been my baby!'"  Patray asserted that "[a] 7-year-old girl ought to be playing with doll babies."[79]

### B.    The Act Is Introduced in Response to the U.S. DOE's Proposed Rule

105.    On April 27, 2021, Rep. Ragan met with colleagues on the House education committee, including Committee Chair Rep. Mark White, to discuss the reaction to the Proposed Rule.

106.    On April 29, just days before the end of the legislative session, Rep. Ragan filed House Amendment 441 ("H.A. 441") to House Bill 580.  Section 51 of H.A. 441 includes much of the text that later became the Act.

---

[76] Chris Butler, *Williamson County Parents Warn Critical Race Theory Has Already Entered Their Public School System*, The Tennessee Star (Apr. 22, 2021), https://tennesseestar.com/news/williamson-county-parents-warn-critical-race-theory-has-already-entered-their-public-school-system/cbutler/2021/04/22/.

[77] Chris Butler, *Williamson County Parents Warn Critical Race Theory Has Already Entered Their Public School System*, The Eagle Forum (Apr. 26, 2021) https://www.tneagleforum.org/blog_direct_link.cfm?blog_id=66670.

[78] Marta W. Aldrich, *How Biden grants and parent concerns of 'indoctrination' spurred Tennessee Republicans to limit how race and racism are taught*, Chalkbeat Tennessee (May 25, 2021), https://tn.chalkbeat.org/2021/5/25/22453738/biden-administration-grants-critical-race-theory-racism-tennessee-republicans-lawmakers-teachers.

[79] *Id.*

107.    H.A. 441 identified 11 concepts, now codified in Tenn. Code § 49-6-1019(a)(1)-(11), that were not to be "include[d] or promote[d] . . . as part of a course of instruction or in a curriculum or instructional program" or in "supplemental instructional materials."  The last three "concepts" that became part of the Ban originated in the Senate.  H.A. 441 also included the full text of what would become subparagraphs (b) and (c) of the Ban, now codified in Tenn. Code § 49-6-1019(b), (c).

108.    Eight of the 11 concepts listed in H.A. 441 were drawn nearly verbatim from Executive Order 13950, issued by President Trump on Sept. 22, 2020.  In the Executive Order, the concepts were described as "divisive concepts."  But the Executive Order did not purport to address public education at any level and was instead directed at the training of federal employees.  The Executive Order's stated purpose was "not to promote race or sex stereotyping or scapegoating in the Federal workforce or in the Uniformed Services, and not to allow grant funds to be used for these purposes.  In addition, Federal contractors will not be permitted to inculcate such views in their employees."

109.    Rep. Ragan introduced his amended version of House Bill 580 in committee on May 3, 2021, just two days before the end of the legislative session.  Some five months earlier, a federal district court preliminarily enjoined the enforcement of the key portions of Executive Order 13950 nationwide on vagueness grounds.[80]  In public hearings concerning the Act, Rep. Ragan did not acknowledge the provenance of subparagraphs (a)(1)-(a)(8) of his proposed amendment, much less that a federal court had already considered the order from which they were drawn and recognized its apparent constitutional infirmities.

---

[80] *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 527 (N.D. Cal. 2020) (nationwide preliminary injunction issued on Dec. 22, 2020).

110.     Rep. Ragan's speech in support of House Bill 580 as amended by H.A. 441, and

the questions that followed from Reps. Harold Love, Yusuf Hakeem, and Antonio Parkinson,

highlight many of the Act's defects.  By way of explaining the proposed amendment to House Bill

580, Rep. Ragan spoke at length about the "subversive factions" that "are seeking to undermine

our unique form of government."[81]   He asserted that:

> These seditious charlatans would, if they could, destroy our heritage
> of ordered individual liberty under the rule of law before our very
> eyes.  Disingenuously, these conniving hucksters masquerade as
> noble champions of the oppressed.  Regrettably, they have
> successfully hoodwinked a number of our fellow citizens into
> becoming what Lenin called "useful idiots."
>
> These sincerely misguided useful idiots have unwittingly
> succumbed to the idea that there are only three classes of people.
> These classes are victims, oppressors and self-appointed guardians
> of equity who will beneficently help victims defeat oppressors.
> These guardian and useful idiots assert victimhood as solely the
> function of group identity based on race, sex, lifestyle, ethnicity, et
> cetera.
>
> Likewise, they maintain only two things are required to be an
> oppressor.  Firstly, an oppressor becomes one by being a member of
> a nonvictim group.  Secondly, even if a former part of a victim
> group, one becomes an oppressor by deceitfully betraying victim
> status and achieving success through merit and hard work.
> Moreover, regardless of their starting station in life, effort, talent,
> skill, or achievement, oppressors are irrevocably guilty of unearned
> privilege.  Furthermore, a victim can never escape their foreordained
> status without help of champions and useful idiots through
> government intervention.  Similarly, even if their circumstances are
> worse than any member of a victim group, an oppressor can never
> atone for the guilt of privilege.

111.     To explain how these issues relate to K-12 education in Tennessee, Rep. Ragan

offered only "quotes from an email forwarded to me concerning a seven-year-old girl in

---

[81] HB0580 Debate, *supra* note 60.

Williamson County after a discussion in public school on principles such as I just described." Rep.

Ragan explained that the email that was forwarded to him asserted that:

> The little girl told her mother, "I'm ashamed that I'm white." The daughter then asked her mother "is there something wrong with me? Why am I hated so much?" The seven-year-old is now in therapy. She is depressed. She doesn't want to go to school, her mother said. The mother goes on, she is scared to death and has even had thoughts of killing herself. Again, we're talking about a seven-year-old child.

> \*      \*      \*

> These email quotes illustrate eloquently why I have proposed this amendment to the language of House Bill 580.

During the brief committee hearing, Rep. Ragan offered no evidence, anecdotal or otherwise,

beyond the "email forwarded to [him]" to establish any pedagogical need for the Ban.

112.    Following Rep. Ragan's statement, Reps. Love, Hakeem, and Parkinson pressed

Rep. Ragan about the need for the Act and the effect it would have on Tennessee public school

educators and students.  During these exchanges, Rep. Ragan acknowledged that the email he

received about the seven-year-old girl in Williamson County was what "prompted" the amendment

to House Bill 580.  In response to a question from Rep. Hakeem about whether "the way history

is taught now is . . . sufficient," Rep. Ragan acknowledged that he was "not qualified to say," but

that he believed that, in light of the DOE's standards, "history is adequately addressed."  He

nevertheless again pointed to the email about the seven-year-old girl and noted that "the question

becomes, are those standards being followed and in fact adhered to and the email that I just quoted

from indicates that it may not be the case."

113.    Rep. Ragan also acknowledged that many of the SBOE's statewide standards

implicate one or more of the prohibited concepts identified in the Act.  For example, Rep. Ragan

noted that the SBOE standards require instruction about the history of slavery, the "three-fifths

compromise," and the *Dred Scott* decision. Rep. Ragan explained that the "idea behind this [amendment] is . . . to ensure that when [history is] presented, it's presented in all facets, both for and against." Rep. Love responded that, "the concern I have is that it's kinda hard to be for or against slavery. You either got to be against it or against it, I think. . . . I want to make sure that our teachers understand that they can teach the facts and not receive retribution." Rep. Ragan asserted that the Act would not prevent instruction about these and similar historical episodes as long as they are "impartially presented . . . as in not favoring one side or the other" under Section 51(b)(2) of the proposed amendment, later codified in Tenn. Code § 49-6-1019(b)(2), which purports to permit "the impartial discussion of controversial aspects of history." Rep. Ragan conceded that "slavery is abhorrent and should never have been countenanced," but he claimed that "we as Tennesseans should not allow the presentation of historical fact to be shaded by someone's personal opinion who is presenting that information."

114. Rep. Ragan returned to this theme in his exchange with Rep. Parkinson, who asked if the amendment would require history to be taught in a "balanced" way. Rep. Ragan explained that "[i]mpartially means without favor to one side or another, you may use the term 'balanced' if you choose." The two engaged in the following colloquy about the meaning and purpose of the Act, during which Rep. Ragan failed to explain how teachers would be able to conform their conduct to the statute while doing the job for which they were hired:

| Rep. Parkinson: | So when the history of 9/11 is taught. What's the good about those individuals that flew the planes into those world banks? So how do they teach that impartially? |
|---|---|
| Rep. Ragan: | I'm not sure I understood your question. The fact of the matter is, I view all human beings as being created in the image and likeness of God. Those who flew those planes were as well. From that standpoint, that's the only |

| | good.  Their deeds, their actions, resulted in the death of nearly 3000 Americans and also created a situation where we went to war with Iraq and Afghanistan and thousands more died.  So, from that standpoint I can't say what they did was good.  But as individual human beings, they are created in the image and likeness of God.  Their choice of behavior I will roundly and soundly condemn. |
|---|---|
| Rep. Parkinson: | So, Mr. Sponsor, so as a teacher, or if you were a teacher or I'm a teacher teaching that, then we are to say that they were created in the image of God just like us?  That's the balance? |
| Rep. Ragan: | That could be a balance.  I would not – that is my personal view.  I would not attempt to put that into the mouth of a teacher who did not share that. |
| Rep. Parkinson: | We're taught about the Holocaust.  Where many, many Jewish people were killed.  How do we teach that impartially?  What's the good about those that acted in the Holocaust?  They were created by God like us? |
| Rep. Ragan: | That would be one avenue to approach that.  I would also mention that we need historical impartiality or balance – not only were up to six million Jews slaughtered in the holocaust, but an equal number of Poles, or residents of Poland, were as well.  So, from that standpoint, history requires us to cover all of it.  The actions of those people who sanctioned the Holocaust and in fact carried it out are reprehensible, there's no other way to describe that.  They were human beings.  They have value as human beings.  But I condemn their behavior unequivocally. |
| Rep. Parkinson: | I just want to be clear on what you're saying. . . .  I'm just trying to be clear because I'm trying to understand how we have a Jewish teacher to teach this and to repeat |

> what you're saying as the balance in this, or the impartiality. How we have an African American teacher to teach this to African American kids that that slave master and those that were involved in the trading of them and the labeling of us or black people as property or as three fifths or less than human, what those teachers are to tell those black kids who are descendants of those individuals, that they were less than human, but these individuals have value and they were created by God also.

115. After approximately 25 minutes of discussion, the committee passed House Bill 580 as amended.

116. On May 4, 2021, the last full day of the legislative session, the full House took up the Act. On the House floor, Rep. Ragan explained the Act by reference to

> self-appointed guardians of equity among us who deludedly seek to make our union far less perfect. In shameless pursuit of political power, these misguided souls leverage social, cultural, and religious factors to fracture our indivisible nation. To create artificial divisions among us, these self-styled noble champions of the oppressed unashamedly distort and twist the truth.[82]

Rep. Ragan asserted that the purpose of the Act is to "emphasize[] that the Tennessee state standards are what are to guide our instructors in choosing what goes into their classrooms, whether it's their lessons or supplemental material."

117. The Act passed the House, and Governor Lee signed the Act into law on May 25, 2021.

---

[82] House Floor Debate, *supra* note 61.

## CLAIM FOR RELIEF

### First Cause of Action

14th Amendment — Vagueness

118.    All prior paragraphs are incorporated herein by reference.

119.    "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). A law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also Faustin v. City & Cty. of Denver*, 423 F.3d 1192, 1201 (10th Cir. 2005). This principle applies to administrative, civil, and criminal prohibitions. *See, e.g., FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012) (civil fines); *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1048–51 (1991) (state bar rule). A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

120.    The Ban is unconstitutionally vague on its face with respect to all Plaintiffs and as applied to Plaintiffs Vaughn, Wilson, Stein, Dickenson and McIntosh because it fails to provide fair notice of what Tennessee public school educators, including the Plaintiffs, can and cannot say, and what materials they can and cannot use, in the course of their employment; and because the Ban allows for arbitrary and discriminatory enforcement, up to and including termination and the loss of teaching licenses.

121.    Educators at every level of Tennessee's K-12 system, including Plaintiffs Vaughn, Wilson, Stein, Dickenson, and McIntosh, and members of TEA who are educators, including Vaughn and Stein, are confused about what they can legally say and do in the course of their employment, and they face the risk of sanctions, including termination and loss of their teaching licenses, for even inadvertent violations of the Ban.

49

122.     As a result of Defendants' unlawful imposition and enforcement of the Ban, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights to due process.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.     Issue permanent injunctive relief enjoining Defendants, their employees, agents, and successors in office from enforcing the Act and the Rules;

2.     Declare Tenn. Code Ann. § 49-6-1019 and Tenn. Comp. R. & Regs. 0520-12-04-.01–.08 unconstitutional, facially and as applied, under the Fourteenth Amendment to the United States Constitution;

3.     Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

4.     Grant such additional relief as the interests of justice may require.

Respectfully submitted,

/s/ *David R. Esquivel*
David R. Esquivel (TN BPR # 021459)
Jeremy A. Gunn (TN BPR # 039803)
BASS, BERRY & SIMS PLC
150 Third Ave. S., Suite 2800
Nashville, TN 37201
Tel. 615-742-6200
Fax 615-742-6293
desquivel@bassberry.com
jeremy.gunn@bassberry.com

Carey R. Dunne *(pro hac vice forthcoming)*
Kevin Trowel *(pro hac vice forthcoming)*
Martha Reiser *(pro hac vice forthcoming)*
FREE AND FAIR LITIGATION GROUP, INC.
266 W. 37th St., 20th Floor
New York, NY 10018
646-434-8604
carey@freeandfairlitigation.org
kevin@freeandfairlitigation.org
martha@freeandfairlitigation.org

Frances E. Bivens *(pro hac vice forthcoming)*
Pascale Bibi *(pro hac vice forthcoming)*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
212-450-4935
frances.bivens@davispolk.com
pascale.bibi@davispolk.com

*Counsel for Kathryn Vaughn, Roland Wilson,
Michael Stein, Rebecca Dickenson, and Mary
McIntosh*

/s/ *Richard L. Colbert*
Richard L. Colbert (TN BPR # 009397)
KAY GRIFFIN EVANS, PLLC
222 2nd Ave. N., Suite 340M
Nashville, TN 37201
Tel. 615-742-4800
Fax 615-742-4801
rcolbert@kaygriffin.com

*Counsel for Tennessee Education Association*