# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| TENNESSEE EDUCATION ASSOCIATION, KATHRYN VAUGHN, ROLAND WILSON, MICHAEL STEIN, REBECCA DICKENSON, and MARY MCENTOSH, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Case No. 3:23-cv-00751 |
| v. | ) ) | Judge Aleta A. Trauger |
| LIZZETTE GONZALEZ REYNOLDS, in her official capacity as Commissioner of the Tennessee Department of Education, and KRISSI MCINTURFF, JORDAN MOLLENHOUR, ROBERT EBY, WARREN WELLS, RYAN HOLT, LILLIAN HARTGROVE, NATE MORROW, LARRY JENSEN, DARRELL COBBINS, and BOB SMITH, in their official capacities as members of the Tennessee State Board of Education, | ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) |  |

## <u>MEMORANDUM</u>

Tennessee Department of Education ("TDOE") Commissioner Lizzette Gonzalez Reynolds ("Commissioner") and the defendant members of the Tennessee State Board of Education ("State Board") have filed a Motion to Dismiss (Doc. No. 41), to which the plaintiffs have filed a Response (Doc. No. 45), the defendants have filed a Reply (Doc. No. 48), and the plaintiffs have filed a Sur-Reply (Doc. No. 54). For the reasons set out herein, the motion will be denied.

# I. INTRODUCTION

Being a teacher means having to make countless difficult decisions. Many of those decisions have to do with instruction itself—what to teach, how to teach it, and what do when those best-laid plans collide with students' sometimes unpredictable responses to the material taught. Tennessee's public school teachers, however, are not expected to figure it all out for themselves. They have the benefit—and the responsibility—of instructing their students in accordance with a lengthy, detailed set of academic standards set, through an open administrative process, by the State Board in consultation with both experienced educators and potentially more policy-focused administrators appointed by elected officials. *See* Tenn. Code Ann. §§ 49-1-309 to -313. These standards dictate the topics that teachers should cover and the benchmarks that their students should be able to meet, while leaving flexibility for individual teachers and schools to pursue the state's mandatory objectives in the manner determined, by the educators on the ground, to best suit any given school or student population. *See* Tenn. Code Ann. § 49-1-314.

In early 2021, the Tennessee General Assembly passed, and the Governor signed, a law that selectively bypasses that ordinary curricular process and administrative structure with regard to a handful of "concepts" that a teacher cannot "include" or "promote" in his or her curriculum, instruction, or supplemental materials. 2021 Tenn. Pub. Laws, ch. 493 (S.B. 623) § 50, *codified as* Tenn. Code Ann. § 49-5-1019 ("the Act"). Not long thereafter, the TDOE issued regulations permitting any of a wide array of "eligible complainants"—in most instances, any student, parent, or employee in the relevant school system, regardless of school—to initiate a mandatory investigatory proceeding under the Act, which can result, ultimately, in teacher discipline and/or the withholding of funds from the relevant school system. *See* Tenn. Comp. R. & Regs. 0520-12-04-.02(6), -.05.

2

Many of the prohibited concepts are ones that it is difficult to imagine any Tennessee teacher actually believing he or she would be permitted to espouse—such as that "[a]n individual's moral character is determined by the individual's race or sex," Tenn. Code Ann. § 49-6-1019(a)(4). The prohibited concepts, however, are also broadly formulated and built around abstract, highly politicized ideas that are undoubtedly subject to a wide array of different interpretations among Tennesseans. If the concepts prohibited by the Act were presented in guidelines, or as part of standards embedded in a larger curricular framework, their vagueness would be something that educators and administrators could navigate together over time, building and refining ways to comply with the state's objectives while still educating students comprehensively and competently. However, because the General Assembly instead chose a system of prohibitions and punishments, and the TDOE followed that up by placing what is essentially prosecutorial power in the hands of a wide array of potentially disgruntled and/or politically motivated private individuals, the teachers have no such luxury.

They do, however, have something else: a right, under the Due Process Clause of the Fourteenth Amendment of the Constitution, not to be punished for "violating" a rule that was written too vaguely for them, or anyone, to possibly understand. This lawsuit is an attempt to vindicate that right. The defendants say it should be dismissed, but, because the plaintiffs have asserted a plausible theory of unconstitutionality that it is within their rights to assert, it will not be.

## II. BACKGROUND[1]

### A. Public Education in Tennessee

Tennessee's Constitution requires it to "provide for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. It does so, in large part, through a system of "local administration," pursuant to which local educational agencies, sometimes referred to as "LEAs," "have the duty and power to manage and control the public schools within their jurisdictions." *Lawrence Cnty. Educ. Ass'n v. Lawrence Cnty. Bd. of Educ.*, 244 S.W.3d 302, 310 (Tenn. 2007); *see* Tenn. Code Ann. § 49-1-102. Those individual schools, in turn, are staffed by individual teachers and administrators who carry out the day-to-day tasks of running the school and educating the students. *See* Tenn. Code Ann. § 49-5-101 to -115.

The ultimate constitutional responsibility for providing the system of free public schools, however, continues to be the state's—and, more specifically, the Tennessee General Assembly's. Tenn. Const. art. XI, § 12. To that end, the General Assembly has created two major state-level entities with supervisory power over the statewide system: the TDOE and the State Board. The TDOE, which is led by the Commissioner, is broadly "responsible for the implementation of law or policies established by the general assembly or the state board of education." Tenn. Code Ann. § 49-1-201(a). Many of the Commissioner's duties are supervisory in nature, such as her duties to "[m]ake tours of inspection" and "publish . . . statistics and other information relative to the public school system." Tenn. Code Ann. § 49-1-201(c)(2), (3). The Commissioner, however, also sometimes exercises rulemaking authority on behalf of the TDOE. *See, e.g.*, Tenn. Comp. R. & Regs. 0520-12-04-.01.

---

[1] The facts are taken primarily from the Complaint (Doc. No. 1) and are accepted as true for the purposes of the Motion to Dismiss.

The Commissioner is appointed by the Governor and, by statute, must "be a person of literary and scientific attainments and of skill and experience in school administration," as well as "qualified to teach in the school of the highest standing over which the commissioner has authority." Tenn. Code Ann. § 4-3-802(b)–(c). The Tennessee Attorney General, however, has interpreted these seemingly mandatory qualifications to impose only a "general standard to be administered principally by the Governor through the appointment and removal process." Tenn. Att'y Gen. Op. No. 24-007 (Apr. 23, 2024).[2] Pursuant to the Attorney General's interpretation, the requirement that the Commissioner be "qualified to teach" would not, in fact, require the Commissioner to actually possess any kind of licensure or certification to teach in any school. *Id.* at 7. Rather, the Tennessee Attorney General has interpreted the statutory requirements for serving as the Commissioner to focus, in significant part, on the "personal traits" of the prospective officeholder, as judged by the Governor. (*Id.*)

The State Board is a multi-member body whose ordinary responsibilities are more directly focused on teaching and instruction. The State Board has the power to "[a]pprove all academic standards and adopt rules and policies governing courses of study in the public schools," "[p]rescribe the use of textbooks and other instructional materials, based on recommendations of the state textbook and instructional materials quality commission, for the various subjects taught or used in conjunction with the public schools," and "[d]evelop and adopt a uniform grading system to be implemented in all public schools in the state for purposes of calculating the cumulative grade point averages of students who are seeking financial academic assistance provided by the state."[3] Tenn. Code Ann. § 49-1-302(a)(8), (9), (14).

---

[2] Available at https://www.tn.gov/content/dam/tn/attorneygeneral/documents/ops/2024/op24-007.pdf.

[3] Tennessee makes scholarships for postsecondary education available to qualifying recent graduates who achieved a high school grade point average of at least 3.0. *See* Tenn. Code Ann. § 49-4-907(3)(A).

5

The defendants in this case, other than the Commissioner, are members of the State Board. (Doc. No. 1 ¶ 18.) Such members are appointed by the Governor, the Speaker of the Tennessee House of Representatives, or the Speaker of the Tennessee Senate, depending on the seat at issue, with the Governor's pick subject to confirmation by the Tennessee General Assembly as a whole. Tenn. Code. Ann. § 49-1-301(a)(3). The State Board, however, is directed to appoint various subject-matter-specific advisory teams and recommendation committees, consisting primarily of working educators, to assist in the development of its educational standards. *See* Tenn. Code Ann. §§ 49-1-311(a), 49-1-313. The committees' recommendations are reviewed by a standards review committee, consisting of members appointed by the Governor and legislature. *See* Tenn. Code Ann. § 49-1-312. Once the state-level standards are adopted, "[e]ach LEA [is] responsible for developing and implementing the instructional programs under the state standards . . . that best fit its students' educational needs, that achieve levels of proficiency or advanced mastery, and that vigorously promote individual teacher creativity and autonomy." Tenn. Code Ann. § 49-1-314.

The State Board also possesses powers that enable it to shape the state's educational workforce. In order to serve as a "principal, teacher or supervisor" of a Tennessee public school, one must be licensed to do so, Tenn. Code Ann. § 49-5-101(a), and the Board oversees the licensure process. *See* Tenn. Code Ann. § 49-1-302(5)(A). The State Board also has the power to "[s]et rules and policies for . . . [e]valuating individual teachers," Tenn. Code Ann. § 49-1-302(a)(2), and "adopt rules and policies governing" the "[d]iscipline of licensed personnel for misconduct by formal reprimand or by the suspension and revocation of licenses and certificates." Tenn. Code Ann. § 49-1-302(a)(5)(A)(iv).

6

Aside from the foregoing, there is at least one more way in which the state exercises significant power in the administration of Tennessee's education system: money. According to the TDOE's figures, about 53% of the contribution to the education system's operating budget comes from the state, with about 37% coming from localities and about 10% coming from the federal government.[4]

## B. Tennessee's State-Level Academic Standards

The curricular policies established by the State Board are set forth in a number of lengthy, detailed documents addressing not only general topics to be covered at particular grade levels, but also specific standards representing "what students should know, understand, and be able to do by the end of a grade level or course." Tenn. State Bd. of Educ., Tenn. Social Studies Standards ("*Social Studies Standards*") at 1.[5] Because these standards set forth a comprehensive, interdisciplinary education, they touch on both highly technical topics, such as mathematics, as well as a number of areas that may overlap with matters of concern—and, potentially, controversy—among the general public or portions thereof.

For example, the standards provide that "[f]ourth grade students will learn about the events that led to U.S. independence, the American Revolution, the growth and development of the U.S. through Manifest Destiny, and the causes and effects of the Civil War and Reconstruction." *Social Studies Standards* at 7. After that, "[f]ifth grade students will learn about the challenges facing the U.S. during the 19th and 20th centuries, with an emphasis on major

---

[4] *See* Tenn. Gen. Assembly, Joint Working Group on Federal Education Funding – Senate, Interim Report of January 9, 2024 at 8, available at
https://www.capitol.tn.gov/Archives/Senate/113GA/committees/Education/2024/20240109_Federal_Funding%20Task%20Force%20Senate%20PrelimReport.pdf. This court is permitted to take judicial notice of "government documents available from reliable sources on the Internet." *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003) (citations omitted).

[5] Available at https://www.tn.gov/content/dam/tn/education/standards/ss/Social_Studies_Standards.pdf.

American wars and events that changed our history." *Id.* Each of those sets of topics inherently implicates some of the most morally challenging events in American history, such as slavery, segregation, and/or the treatment of North America's indigenous population.

As the students progress to middle school, their grappling with those topics is to go further in depth. A student who completes an eighth grade course on "United States History and Geography," for example, should be able to "[t]race the rise of the Ku Klux Klan and vigilante justice in the South" (Standard 8.73) and "[e]xplain the restrictions placed on the rights and opportunities of freedmen, including . . . racial segregation [and] black codes" (Standard 8.72). *Id.* at 115.

Once students reach high school, this expectation of greater depth continues, with an emphasis on fostering students' capacity for "inquiry and critical thinking." *Id.* at 117. At times, that may call on students to compare and contrast different beliefs, ideologies, and ways of life. For example, a high school student who completes a course in "Ancient History" should be able to "[c]ompare and contrast the city-states of Athens and Sparta, explaining social structures, the significance of citizenship, and rise of early democracy" (Standard AH.22) and "[d]iscuss the reasons for the decline and fall of the Western Roman Empire" (Standard AH.34). *Id.* at 133–34. Students, however, may also have to answer similar questions that hit closer to home. For example, Standard CI.13 requires a student in a "Contemporary Issues" course to be able to "[c]ompare and contrast American civil liberties and protections, as defined by the Bill of Rights, to those of other nations." *Id.* at 144.

The bearing of the standards on potentially controversial issues is not limited to history instruction. For example, the standards also provide a framework for high school instruction in economics, which calls on students to "explore the concepts of scarcity, supply and demand,

8

market structures, national economic performance, money and the role of financial institutions, economic stabilization, and trade" and "examine key economic philosophies and economists who have and continue to influence economic decision making" (*Id.* at 146.) By the end of the course, the student should be able to "[c]ompare and contrast the theoretical principles of capitalism, socialism, and communism, as expressed through theorists such as Adam Smith and Karl Marx" (Standard E.07). *Id.* at 149.

## B. The Act and Implementing Regulations

### 1. The Act

The bill that eventually became the Act was sponsored by Representative John Ragan, who explained that statutory intervention was, in his view, called for to combat "subversive factions" of "seditious charlatans," who "masquerade as noble champions of the oppressed" in order to "undermine our unique form of government." (Doc. No. 1 ¶ 110.[6]). Representative Ragan acknowledged that the State of Tennessee already had academic standards providing guidance for how Tennessee teachers should instruct their students regarding various potentially controversial topics. Representative Ragan argued, however, that the new enactment was necessary to "re-emphasiz[e] what should be already . . . the case."[7] He was pressed further by Representative Yusuf Hakeem on whether "the way history is taught now" was already "sufficient," to which Representative Ragan responded that he was "not qualified" to answer the

---

[6] Tennessee General Assembly, HB0580, House Education Administration Committee (May 3, 2021), https://tnga.granicus.com/player/clip/24828?view_id=610&meta_id=607792&redirect=true&h=ddcbfd6e7ad3069e551a5207b4c59cad ( "May 3, 2021 Education Committee Debate") at 2:05.

[7] *Id.* at 12:50.

question and "would have to defer on that."[8] He ultimately conceded, however, that "history is adequately addressed" by the preexisting standards, if adhered to.[9]

The Act dictates that a Tennessee LEA or a public charter school "shall not include or promote" certain enumerated "concepts as part of a course of instruction or in a curriculum or instructional program, or allow teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include or promote" those concepts. Tenn. Code Ann. § 49-6-1019(a). The concepts that an LEA "shall not include or promote" are as follows:

(1)  One (1) race or sex is inherently superior to another race or sex;

(2)  An individual, by virtue of the individual's race or sex, is inherently privileged, racist, sexist, or oppressive, whether consciously or subconsciously;

(3)  An individual should be discriminated against or receive adverse treatment because of the individual's race or sex;

(4)  An individual's moral character is determined by the individual's race or sex;

(5)  An individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(6)  An individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex;

(7)  A meritocracy is inherently racist or sexist, or designed by a particular race or sex to oppress members of another race or sex;

(8)  This state or the United States is fundamentally or irredeemably racist or sexist;

(9)  Promoting or advocating the violent overthrow of the United States government;

_____

[8] *Id.* at 13:40.

[9] *Id.* at 14:10.

(10) Promoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people;

(11) Ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex;

(12) The rule of law does not exist, but instead is a series of power relationships and struggles among racial or other groups;

(13) All Americans are not created equal and are not endowed by their Creator with certain unalienable rights, including, life, liberty, and the pursuit of happiness; or

(14) Governments should deny to any person within the government's jurisdiction the equal protection of the law.

Tenn. Code Ann. § 49-6-1019(a). The Act provides no definition of, for example, "privilege," "division," "rule of law," "meritocracy," "inherently," "irredeemably," "racist," "sexist," "oppressive," or "created equal."

The Act includes a caveat that it "does not prohibit an LEA or public charter school from including, as part of a course of instruction or in a curriculum or instructional program, or from allowing teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include," the following:

(1) The history of an ethnic group, as described in textbooks and instructional materials adopted in accordance with part 22 of this chapter;

(2) The impartial discussion of controversial aspects of history;

(3) The impartial instruction on the historical oppression of a particular group of people based on race, ethnicity, class, nationality, religion, or geographic region; or

(4) Historical documents relevant to subdivisions (b)(1)-(3) that are permitted under § 49-6-1011.[10]

---

[10] Tenn. Code Ann. § 49-6-1011 permits the teaching of "historically significant or venerated documents," including historical laws and judicial opinions.

11

Tenn. Code Ann. § 49-6-1019(b). These provisions are sometimes referred to as the Act's "Impartiality Clause." The Act, however, does not define "controversial" or "impartial."

Other than the brief citation to existing standards in the Impartiality Clause, the Act makes no express effort to reconcile its terms with the sizable preexisting structure for establishing standards in Tennessee public education. Instead, it creates a punitive enforcement mechanism distinct from that structure, whereby, "[i]f the commissioner of education finds that an LEA or public charter school knowingly violated this section, then the commissioner shall withhold state funds, in an amount determined by the commissioner, from the LEA or public charter school until the LEA or public charter school provides evidence to the commissioner that the LEA or public charter school is no longer in violation of this section." Tenn. Code Ann. § 49-6-1019(c).

## 2. The Rules

On May 8, 2022, the TDOE, purportedly acting pursuant to the Commissioner's general implementation authority, *see* Tenn. Code Ann. § 49-1-201, issued regulations "to effectuate" the Act. Tenn. Comp. R. & Regs. 0520-12-04-.01 to -.08 ("the Rules"). The Rules include a definition section that does try to add some specificity to one term used in the list of prohibited concepts, explaining that "'[p]rivileged' means having a special advantage or right." Tenn. Comp. R. & Regs. 0520-12-04-.02(9). The Rules also explain that a "'[c]ourse of instruction'means a unit of academic instruction which includes a series of lessons or meetings designed to meet specific educational goals," and "'[s]upplemental instructional materials' means materials used in conjunction with the core instructional materials of a course." Tenn. Comp. R. & Regs. 0520-12-04-.02(1), (13). The Rules otherwise leave the aforementioned terms

12

undefined, choosing, instead, to simply reiterate the prohibited concepts in the same language used by the Act. *See* Tenn. Comp. R. & Regs. 0520-12-04-.03.

The Rules require an LEA or public charter school to "[e]nsure compliance with [the Act] by investigating suspected violations and complaints alleging violations" of its terms. Tenn. Comp. R. & Regs. 0520-12-04-.04(1)(a). The most substantial addition of the Rules, however, is its establishment of an administrative structure through which "eligible complainants" are encouraged to submit complaints alleging violations of the Act. Under the Rules' definitions, "'[e]ligible complainant' means a current student of the LEA or public charter school in which the allegation(s) arose, a parent of a current student of the LEA or public charter school in which the allegation(s) arose, or a current employee of the LEA or public charter school in which the allegation(s) arose." Tenn. Comp. R. & Regs. 0520-12-04-.02(6). The complainant is not required to have any specific connection to the particular class, grade level, or school at issue. For example, the parent of a child at an elementary school on one side of a countywide school district could file a complaint about an instance of instruction he or she heard about at a high school miles away, on the basis that the complainant's child was a "current student of the LEA . . . in which the allegation(s) arose." An LEA or public charter school is required to provide "annual notice" of the Act to "staff, students, and parents" and to "[p]ost [a] complaint form provided by the [TDOE] for filing a complaint alleging violations of [the Act] on the LEA or public charter school's website." Tenn. Comp. R. & Regs. 0520-12-04-.04(1)(b), (f).

After any eligible complainant lodges a complaint, then the LEA or public charter school must initiate an investigation pursuant to procedures set out in the Rules. *See* Tenn. Comp. R. & Regs. 0520-12-04-.05(6)–(9). "Within sixty (60) calendar days of receiving the complaint, the LEA or public charter school shall determine whether the allegation(s) in the complaint is

13

substantiated." Tenn. Comp. R. & Regs. 0520-12-04-.05(8). "If an alleged violation is substantiated, the LEA or public charter school shall take appropriate remedial action to ensure that the Prohibited Concept(s) is no longer included in a course of instruction, curriculum and instructional program, or supplemental instructional materials." Tenn. Comp. R. & Regs. 0520-12-04-.05(10).

If either the complainant or the subject of the complaint is unhappy with the LEA's initial determination, he or she may appeal directly to the TDOE. The appeal is considered, first, by a "[d]epartment review team" possessing investigatory powers, such as "the authority to . . . [i]nterview the complainant, the individual alleged to have included or promoted the Prohibited Concept, or any other individual deemed necessary by the Department." Tenn. Comp. R. & Regs. 0520-12-04-.07(6). Within fifty days of receiving the appeal, the review team is to provide a recommendation to the Commissioner, who then has another sixty days—subject to extension for "exceptional circumstances"—to make a final determination regarding the appeal. Tenn. Comp. R. & Regs. 0520-12-04-.07(7)–(8). A party aggrieved by that determination may challenge it under the Tennessee Uniform Administrative Procedures Act, Tenn. Code Ann. §§ 4-5-301 to -326. Tenn. Comp. R. & Regs. 0520-12-04-.07(10).

The Rules include a process for "early resolution" of complaints that purports to encourage LEAs and public charter schools to "work collaboratively with parents, teachers, and other employees to resolve concerns and complaints as quickly as possible." Tenn. Comp. R. & Regs. 0520-12-04-.06(a). That provision, however, does not require complainants to engage in any kind of good faith process to reach a resolution. Rather, it merely encourages an LEA or public charter school to commit, in writing, to a binding "resolution agreement," requiring the school to take some course of action that sufficiently placates the complainant, which the

complainant can then enforce against the school if he or she believes that it is out of compliance. *See* Tenn. Comp. R. & Regs. 0520-12-04-.06(4).

The Rules specifically endorse, as a form of remedial action, "[d]isciplinary action against a teacher," if the relevant LEA "determines that the complained of individual affirmatively and intentionally included or promoted the concept at issue in a course of instruction, curriculum and instructional program, or supplemental instructional materials." Tenn. Comp. R. & Regs. 0520-12-04-.05(8)(b), (10)(b). Tennessee rules regarding teacher discipline permit the State Board to, among other things, suspend or revoke a teacher's license, rendering the teacher unable to serve in a Tennessee public school. *See* Tenn. Comp. R. & Regs. 0520-02-03-.09(5), (9). The Rules also direct the Commissioner to impose a corrective action plan on any LEA or public charter school found to have "knowingly" violated the Act. Tenn. Comp. R. & Regs. 0520-12-04-.08(5). The Commissioner is then required to withhold no less than 2% and as much as 10% of the LEA's annual state funds "until the requirements of the corrective action plan have been met." Tenn. Comp. R. & Regs. 0520-12-04-.08(7).

## C. Early Proceedings under the Rules

Although the Act is a relatively recent enactment, there is some evidence of its practical effects. The plaintiffs describe the predicament of Terri Bradshaw, a teacher in the Blount County school system and "one of the first Tennessee public school teachers subjected to an enforcement proceeding" under the Rules.[11] (Doc. No. 1 ¶ 67.) During the 2021–22 school year, Bradshaw served as a "curricular instructor," meaning that she "work[ed] with teachers across the county to ensure that they understood the state education standards and had effective strategies for teaching the modules described in the state-approved curriculum." (*Id.* ¶ 68.) That

---

[11] Bradshaw is not an individual plaintiff in this case, but the plaintiffs have provided her story as an example of how the Act has functioned.

year's sixth grade curriculum included the Newberry Medal-winning 1975 book *Dragonwings*, by Lawrence Yep. Bradshaw did not make the decision to include *Dragonwings* in the curriculum, nor did she do any of the actual instruction of students in connection with the book. Her responsibility was, rather, to prepare other teachers for teaching it. (*Id.* ¶¶ 68, 74.)

According to the plaintiffs, *Dragonwings* "addresses the challenges, including racial prejudice, faced by immigrants to the United States," particularly those who, like the book's young protagonist, immigrated from China in the early twentieth century. (*Id.* ¶ 69.) In the book, the term "'white demons' . . . is used at times . . . to refer to white Americans." (*Id.* ¶ 70.) Bradshaw advised teachers regarding that potentially provocative language, including by "advis[ing] that teachers should discuss the novel as a whole, should not focus on isolated words and phrases taken out of context, and should explain to students that the term ['demons'] would not have had the same derogatory connotation in the characters' native Chinese culture as it has in American culture." (*Id.*) Bradshaw also explained to teachers that, if any parent objected to the teaching of *Dragonwings*, that parent's student could instead receive "alternate independent study material." (*Id.* ¶ 71.)

In February 2022, a parent of a student at Blount County's Union Grove Middle School filed a formal complaint asserting that *Dragonwings* improperly included or promoted four concepts prohibited by the Act: first, that "[a]n individual's moral character is determined by the individual's race or sex," Tenn. Code Ann. § 49-6-1019(a)(4); second, that "[a] meritocracy is inherently racist or sexist, or designed by a particular race or sex to oppress members of another race or sex," Tenn. Code Ann. § 49-6-1019(a)(7); third, "[p]romoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people," Tenn. Code Ann. § 49-6-1019(a)(10); and, finally, "[a]scribing character traits, values,

moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex," Tenn. Code Ann. § 49-6-1019(a)(11). (Doc. No. 1 ¶ 72.) The parent characterized the book as promoting an "anti-American agenda" and "referring to Americans as demons." (*Id.* ¶ 72.) The parent named Bradshaw and two of Bradshaw's supervisors as the individuals at fault. (*Id.* ¶ 74.)

A months-long process of investigation and administrative consideration followed, during which Bradshaw faced the possibility of eventual direct discipline. First, the Director of the Blount County Schools investigated the matter, ultimately making eight pages of factual findings and concluding that the parent's complaint was not substantiated. The findings went into significant detail involving the novel, its thematic content, and different uses of the word "demon," as well as the general principle that depiction of a behavior or attitude in fiction is not necessarily promotion of the behavior. The Director noted that the book's young immigrant protagonist "progresses from an uninformed perception to an emerging understanding of people who are different from him" and that the novel "contains counter-examples of white American characters who are portrayed in a positive light." (*Id.* ¶ 76.)

The parent was not satisfied and appealed to the TDOE, as the Act permits. Bradshaw and her colleagues submitted nearly 250 pages of material, including detailed citations to *Dragonwings*. (*Id.* ¶ 77.) Bradshaw has estimated that she "devoted more than 40 hours outside of her normal working hours to reviewing materials, preparing responses to the complainant's allegations, and preparing for her interview by representatives from the . . . Commissioner's office." (*Id.* ¶ 78.) On June 10, 2022, a TDOE review team issued a report and recommendation to then-TDOE Commissioner Penny Schwinn, recommending that Schwinn conclude that *Dragonwings* did not violate the Act. Schwinn accepted the recommendation, concluding the

matter. (*Id.* ¶¶ 79–80.) The TDOE based its conclusion, in part, on the fact that "[n]ovels are taught as a whole, not as a series of isolated quotations" and that a review of the book as a whole confirmed that it "promotes an optimistic view of the characters' ability to change perspectives and to build relationships across racial and cultural differences." (*Id.* ¶ 79.) Ultimately, this long and labored process exonerated Bradshaw, but it did not save *Dragonwings*. The book was removed from the curriculum anyway, before the investigation was even completed and while many students were in the middle of reading it. (*Id.* ¶ 81.)

Bradshaw's successful defense, moreover, did not spare her from public shaming in connection with the Act. According to the plaintiffs, "[t]he controversy over *Dragonwings* was covered widely by the press in Tennessee and beyond, as was the removal of *Dragonwings* from Union Grove's curriculum following the parent's complaint." (*Id.* ¶ 82.) Bradshaw—who did not write, select, or teach the book, but had the misfortune to find her name on a form filled out by an angry parent—was "identified in various hostile social media posts concerning the book and the complaint." (*Id.*)

**D. This Lawsuit**

1. The Plaintiffs

The Tennessee Education Association ("TEA") is a "non-profit, voluntary membership organization of education professionals in the State of Tennessee who work as pre-kindergarten through twelfth grade educators in the more than 140 public school districts throughout the state." (*Id.* ¶ 10.) Its stated mission is to "protect and advocate for students, the education profession, and its members to create great public schools that prepare Tennesseans for success in a global society." (*Id.*) The TEA is suing on behalf of its members, which include the individual plaintiffs. (*Id.* ¶¶ 12–16.)

For example, plaintiff Rebecca Dickenson is a librarian at Eagleton Elementary School in Blount County. (*Id.* ¶ 15.) As part of her duties, Dickenson often reads aloud to younger students and assigns research projects to older students. Those commonplace pedagogical practices mean that Dickenson's course of instruction potentially touches on a wide array of books by a diverse set of authors over time. As a result, she is concerned that she might inadvertently violate the Act in connection with one or more books. For example, she sometimes reads students a book about Rosa Parks and the civil rights movement, which she fears could draw complaints. She is concerned that research assignments touching on straightforward features of American history could do the same and that they could, in particular, be viewed as "promoting division" or "resentment" along racial lines, as forbidden by the Act. Tenn. Code Ann. § 49-6-1019(a)(10). (Doc. No. 1 ¶ 95.)

As the president of her local TEA chapter, Dickenson attends school board meetings, and she says that, "[s]ince the passage of the [Act], and especially since the *Dragonwings* controversy . . . , there have been complaints at every meeting about books and the school curriculum, often coupled with *ad hominem* attacks on teachers." (*Id.* ¶ 96.) Those attacks have included accusations that teachers and administrators are intentionally sexually "grooming" children. (*Id.*) Those accusations were, as one might expect, only amplified by social media. A clip of the aforementioned exchange was posted on Facebook, where one user responded to the allegation of "grooming," "[I]f the shoe fits, wear it." (*Id.*)

Michael Stein teaches English at Coffee County Central High School in Manchester. (*Id.* ¶ 14.) Among Stein's responsibilities is the teaching of English as a Second Language ("ESL") courses for which the State Board has issued no approved curriculum. In the absence of such a curriculum, ESL teachers like Stein are required to build their own, and Stein, in light of his

19

students' ages and reading levels, often assigns what are typically referred to in the publishing industry as "young adult novels." Many of these novels, however, touch on issues of race and gender, which Stein has found to be areas of interest for his students. Stein is concerned that he now has the burden of selecting novels pursuant to the vague standards of the Act. (*Id.* ¶ 93.)

Roland Wilson teaches music and directs the choir at Central High School in Memphis, Tennessee. (*Id.* ¶ 13.) Wilson says that, "[t]o ensure his students are exposed to a wide range of music, [he] typically selects a diverse array of musical pieces for his students to sing, including works in foreign languages, works written by European artists during the Renaissance, and African American spirituals composed by enslaved people in the antebellum South." (*Id.* ¶ 88.) Since the enactment of the Act, however, he has grown concerned about teaching the spirituals and situating them in a historical context, which would, by necessity, require a discussion of the practice of slavery in the United States, leaving him at risk of complaints and a potential finding of a violation based on the belief of a single parent, student, or co-worker that his teaching of that material was not impartial. (*Id.*)

Kathryn Vaughn teaches visual arts at Brighton Elementary School in Tipton County. (*Id.* ¶ 12.) She says that she "fears that her lessons will violate the [Act] and subject her to discipline, including termination and loss of her teaching license." (*Id.* ¶ 85.) In particular, she is worried "about presenting her students with artistic works by certain artists whose political views . . . could be understood as implicating the prohibited concepts." (*Id.*) For example, in the past, Vaughn has led classroom discussions of the Frida Kahlo painting *The Wounded Deer*. Now, however, she is "concerned that Ms. Kahlo's political views . . . could implicate the prohibited concepts identified in the [Act]." (*Id.* ¶ 85.) She has the same concerns regarding the work of artist Keith Haring, who was known for "political activism and advocacy for victims of the AIDS

20

epidemic." (*Id.*) Although Vaughn teaches these artists' work, not their political views, she is concerned that favorably discussing them could be construed as promoting those views. (*Id.*)

In June 2021, Vaughn attended a meeting of the Tipton County Republican Party where the Act was discussed. Among the items characterized as "divisive" and "horrible" was the discussion, in a Tipton County Board of Education-approved textbook, of the Chinese immigrant experience in the United States. (*Id.* ¶ 86.) The complaints raised at that meeting, as well as the treatment of *Dragonwings* in Blount County, left Vaughn concerned about whether there was any way to discuss the immigrant experience—for example, in connection with her lessons involving masks for Chinese New Year's parades—without drawing the ire of a complainant who views any acknowledgment of that experience as divisive. (*Id.*)

Mary McIntosh taught social studies at Memphis's Central High School through the 2022–23 school year and expects to continue serving the Shelby County Schools as a substitute teacher. (*Id.* ¶ 16.) In the past, she has taught TDOE-approved courses involving contemporary issues, including some involving race. After the Act was adopted, she removed significant portions of the curriculum, because she was unable to determine whether or not they violated the Act. (*Id.* ¶ 97.) Now, as McIntosh transitions to substitute teaching, she faces a new set of fears. She says that she "believes that the [Act] creates substantial risks for her as a substitute teacher because she will have less familiarity with the students she is teaching on any given day, less control over the lessons planned for that day, and, in some cases, less familiarity with the subject matter than she had when she was teaching full-time." (*Id.* ¶ 98.) She is worried that she will, in essence, simply be thrown into the deep end to fend for herself, in classes not of her own devising, with an ever-present risk of the loss of her reputation, license, and employment. (*Id.* ¶ 98.)

2. Procedural History

On July 25, 2023, the plaintiffs filed their Complaint in this case. (Doc. No. 1.) They state one cause of action pursuant to 42 U.S.C. § 1983, which creates a civil claim for any person within the jurisdiction of the United States who was deprived of a federal right under the color of law. (*Id.* ¶¶ 118–22.) The relevant federal right, in this instance, is the right to due process under the 14th Amendment of the Constitution, which requires, among other things, that an individual not be subjected to any prohibition unless the prohibition is sufficiently clear to provide fair notice of what is proscribed. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). The plaintiffs assert that the Act "is unconstitutionally vague on its face with respect to all Plaintiffs and as applied to Plaintiffs Vaughn, Wilson, Stein, Dickenson and McIntosh because it fails to provide fair notice of what Tennessee public school educators, including the Plaintiffs, can and cannot say, and what materials they can and cannot use, in the course of their employment," while permitting the defendants to engage in "arbitrary and discriminatory enforcement, up to and including termination and the loss of teaching licenses." (*Id.* ¶ 120.) The plaintiffs seek a permanent injunction enjoining the defendants from enforcing the Act or Rules, as well as a declaration that the Act and the Rules are "unconstitutional, facially and as applied." (*Id.* at 50.)

On September 22, 2023, the defendants filed a Motion to Dismiss, raising three arguments. (Doc. No. 41.) First, they argue that the court lacks jurisdiction over the plaintiffs' claims because the plaintiffs lack standing. Second, they argue that, if the court has jurisdiction, it should nevertheless abstain from resolving this dispute, in order to permit Tennessee courts to provide further interpretation of the Act. Finally, they argue that the plaintiffs' arguments regarding unconstitutional vagueness fail on the merits. (Doc. No. 42 at 1–2.)

# III. LEGAL STANDARD

## A. Rule 12(b)(1)

"Rule 12(b)(1) motions to dismiss for lack of subject-matter jurisdiction generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). When a Rule 12(b)(1) motion contests jurisdiction factually, the court must weigh the evidence in order to determine whether it has the power to hear the case, without presuming the challenged allegations in the complaint to be true. *Id.*; *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004). However, if a Rule 12(b)(1) motion challenges subject matter jurisdiction based on the face of the complaint, as this one does, the plaintiff's burden is significantly less demanding. *Musson Theatrical Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). A court evaluating a facial attack to the assertion of subject matter jurisdiction must consider the allegations of fact in the complaint to be true and evaluate jurisdiction accordingly. *Genetek*, 491 F.3d at 330; *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999).

## B. Rule 12(b)(6)

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not

whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## IV. ANALYSIS

### A. Standing

A party seeking to invoke the court's jurisdiction must establish the necessary standing to sue, before the court may consider the merits of that party's cause of action. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990). To establish standing under the Constitution, a plaintiff must show that: (1) he has suffered an "injury in fact" that is (a) concrete and (b) particularized, as well as (c) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

The defendants argue that the plaintiffs lack standing because they have not established an actual or imminent injury-in-fact, which, the defendants suggest, the plaintiffs could only show by establishing either that (1) the Act has actually been enforced against them or (2) there is a "certain threat" of enforcement, a phrase that the defendants take from a single Sixth Circuit case, *Crawford v. United States Dep't of Treasury*, 868 F.3d 438, 455 (6th Cir. 2017). As the plaintiffs point out, the defendants' argument depends on some sleight of hand. They argue as if *Crawford* requires a certainty of *enforcement*, when, by its own language, it requires only that a plaintiff be certainly *threatened* by the possibility thereof. It seems unlikely, then, that *Crawford* actually amounted to a repudiation of the long line of caselaw recognizing standing based on, for example, a "substantial probability" or "credible threat" of enforcement. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (quoting *Warth v. Seldin*, 422 U.S. 490, 504 (1975)). Indeed, *Crawford* expressly stated that it was drawing its rule from those cases and used that language itself elsewhere. *Crawford*, 868 F.3d at 455.

*Crawford*, in any event, was about a very different type of situation than the plaintiffs'. The law at issue in *Crawford* was the Foreign Account Tax Compliance Act ("FATCA"), which "imposes account-reporting requirements (and hefty penalties for noncompliance) on both individual taxpayers and foreign financial institutions." *Id.* at 443. The relevant plaintiffs[12] were private individuals who wished to engage in conduct that arguably violated the Act but who had only speculated that they would be subject to enforcement proceedings if they did so. The Sixth

---

[12] One plaintiff was a U.S. Senator who raised an issue regarding whether a particular regulation issued in connection with FATCA should have been subject to congressional approval. Because the Senator did not challenge FATCA itself and asserted no rights directly related to "enforcement," his claims, which were dismissed under principles related to the unique question of legislative standing, are immaterial to the present analysis. *See Crawford*, 868 F.3d at 460.

25

Circuit rejected their arguments and concluded, based on its reading of prior Supreme Court opinions, that, "to have standing to bring a pre-enforcement challenge to a federal statute, there must be a *substantial probability* that the plaintiff actually will engage in conduct that is *arguably affected* with a constitutional interest, and there must be a *certain* threat of prosecution if the plaintiff does indeed engage in that conduct." *Id.* at 455 (emphasis in original). It is debatable whether *Crawford* actually announced any kind of new standard for any situation. However, the court will accept, for the purposes of the present motion, that *Crawford* sets forth the governing standard for claims by individuals who wish to engage in a wholly private course of action, like an economic transaction, and who face no potential injury other than the fact that the government might bring an enforcement action against them if they do.

These plaintiffs, though, are not private actors, intending to engage in a purely private course of action and facing no potential injury other than the bare possibility that some fine might, thereafter, be imposed on them. They are, rather, public employees of the LEAs that the Act governs, with an affirmative statutory duty to comply with the State's education laws. *See* Tenn. Code Ann. § 49-5-1003(b)(1). The Act does not say, as many laws do, that the actions it prohibits merely "are unlawful" for any person to perform or something along those lines. The Act is, rather, a directive to existing public servants, including the plaintiffs; it specifically commands that an LEA "shall not" do something "or allow" a teacher to do so on its behalf. Tenn. Code Ann. § 49-6-1019(a). By the Act's own terms, then, the plaintiffs are not in a position to simply wait around to see if and when enforcement actions are commenced. The plaintiffs have a direct obligation to implement the Act themselves. *Crawford* does not address any such situation, meaning that the court cannot use its isolated holding, or the defendants'

26

reading of that holding, to disregard the substantial body of other cases—including those at the Supreme Court level—that recognize a less rigid approach.

In addition to the aforementioned cases recognizing standing based on a substantial probability of enforcement, Supreme Court caselaw suggests that a plaintiff can demonstrate an injury-in-fact, for standing purposes, by showing that a challenged law forced him to materially alter his behavior. *See Clements v. Fashing*, 457 U.S. 957, 962, 102 S. Ct. 2836, 2843, 73 L. Ed. 2d 508 (1982) (finding standing where officeholder plaintiffs alleged that, "but for the . . . provision they seek to challenge, they would engage in the very acts that would trigger the enforcement of the provision"). For similar reasons, an injury-in-fact can arise, not merely out of actual or even expected enforcement actions, but also "costly, self-executing compliance burdens." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997) (citation omitted); *accord Hyman v. City of Louisville*, 53 F. App'x 740, 743 (6th Cir. 2002); *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (finding standing because "plaintiffs . . . , if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution") (citing *Craig v. Boren*, 429 U.S. 190, 194 (1976); *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016) ("[A]dditional compliance burdens may serve as an injury in fact.") (citing *All. for Nat. Health U.S. v. Sebelius*, 775 F. Supp. 2d 114, 120–21 (D.D.C. 2011)).

The plaintiffs' claims fall squarely within those principles governing injuries arising out of self-executing burdens. The plaintiffs are not simply private individuals worried that they will do something, at some point in the future, and, then, within the discretion of some government actor, possibly be made subject to enforcement proceedings. The plaintiffs are engaged in affirmative, ongoing conduct, at the direct behest of the government, which requires them to

27

make decisions regarding compliance with the Act *right now*. The defendants' arguments simply erase this fact about the plaintiffs' predicament.

For example, the defendants appeal to the Tenth Circuit's admonition that a plaintiff's "moral outrage, however profoundly and personally felt, does not endow [a plaintiff] with standing to sue." *Schaffer v. Clinton*, 240 F.3d 878, 884 (10th Cir. 2001). (Doc. No. 42 at 1.) The plaintiffs, however, are not simply bystanders, sitting on the sidelines of the Tennessee education system and nursing a sense of cultivated outrage. Such angry-for-the-sake-of-being-angry people undoubtedly do exist. The plaintiffs, however, are not among them; they are teachers with current obligations under the Act. They have told the court, clearly and explicitly, that the Act is currently shaping the way they perform their essential public duties. That is far more than simple outrage.

The defendants nevertheless suggest that the court should find a lack of standing pursuant to the so-called "*McKay* factors"—set out in *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)—that the Sixth Circuit has sometimes looked to in pre-enforcement challenges. The Sixth Circuit has been clear that the *McKay* factors "are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021). However, it bears noting that at least one of the *McKay* factors strongly favors a finding of standing here: the fact that "an attribute of the challenged statute . . . makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *McKay*, 823 F.3d at 869 (citing *Susan B. Anthony List*, 573 U.S. at 163; *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 452 (6th Cir. 2014)). The Act and the Rules, taken together, have two such attributes. The first is the public enforcement mechanism that *McKay* explicitly acknowledges. While the Rules do not permit a complaint to

be brought by any person under the sun, the list of potential complainants is so broad that it undoubtedly falls within what is contemplated by *McKay*. The second feature making enforcement unusually likely is the fact that, as the court will discuss in greater detail later in this opinion, the open-ended, value-laden language of the Act aggressively encourages and enables such private enforcement actions. The *McKay* factors, therefore, give the court no basis for disregarding the fact that ordinary standing principles support the plaintiffs' claims.

The defendants argue next that, even if the plaintiffs' injuries are theoretically sufficient to support a cause of action against some hypothetical defendant, they are not sufficient to support this cause of action against these defendants, because the plaintiffs' injuries are not "fairly traceable to" an action by the defendants or "redressable by a favorable ruling" in the plaintiffs' favor. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2752 (2010)). This argument—which the defendants first raise generally and later reiterate as particularly applicable to the Commissioner—is a bit difficult to follow. It appears that it may simply be a reframing of the defendants' general hostility to pre-enforcement challenges. Insofar as it is a distinct argument, however, it has no merit.

Enforcement of the Act, by its own terms, flows directly through the Commissioner, whom it specifically directs to "withhold state funds, in an amount determined by the commissioner, from the LEA or public charter school until the LEA or public charter school provides evidence to the commissioner that the LEA or public charter school is no longer in violation of this section." Tenn. Code Ann. § 49-6-1019(c). The Rules—which the Commissioner promulgated—extend that authority to direct power over individual teachers by making the Commissioner the final word on any appeal of an alleged violation. Tenn. Comp. R.

29

& Regs. 0520-12-04-.05(10). The Commissioner protests that any teacher discipline pursuant to the Act will be imposed and administered by LEAs and the Board, not her, but that does nothing to change the fact that she is an essential link in the chain of the Act's enforcement. Standing in an *Ex parte Young* action[13] does not require a defendant official to be solely responsible for the injury at issue, only that the official be one of the "state actors whose conduct resulted in the injury," such that prospective relief would prevent the injury from continuing. *Durham v. Martin*, 905 F.3d 432, 434 (6th Cir. 2018). It is well-settled that an official who is "actively involved with administering" the very scheme at issue, such that the official "regularly acts in furtherance of its execution," is one such appropriate defendant. *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015). The Commissioner fits that bill, as do the members of the Board.[14]

Finally, in the alternative, the defendants argue that, insofar as the plaintiffs have standing to challenge some provisions of the Act and the Rules, they have no standing to challenge "each provision" of the Act. (Doc. No. 42 at 8.) Specifically, they allege that "each [t]eacher fails to plead facts that undergird claims against Tenn. Code Ann. § 49-6-1019(a)(5), (6), (8), (9), and (12)." (*Id.* at 9.) The defendants, though, are simply wrong about that, because each of those provisions is modified by the same preceding phrase that the plaintiffs have specifically identified as impermissibly vague—"include or promote the following concepts"— as well as the challenged Impartiality Clause. Tenn. Code Ann. § 49-6-1019(a)–(b). The plaintiffs, moreover, have been clear that their injury does not simply involve a few discrete

---

[13] *Ex parte Young,* 209 U.S. 123 (1908), allows suits for prospective injunctive relief against state officials sued in their official capacities, even if a claim for damages would be barred by sovereign immunity. *See Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013).

[14] This argument fares no better when the defendants try to reframe it as about sovereign immunity or a supposed attempt to impose vicarious liability. This is a textbook *Ex parte Young* action based on the Commissioner's and State Board's direct responsibilities under the Act and the Rules.

potential violations of the Act, but also the burden of complying with the Act's requirements in connection with actions, such as the selection of supplemental reading materials, that could implicate the Act in any number of ways.

In any event, as the plaintiffs point out, the question of whether any non-vague portions of the Act, insofar as there are any, should survive is ultimately a question of severability that the court cannot resolve now. *See Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) (quoting *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 371 (6th Cir. 2006)). The teachers' injuries arising out of the responsibility to teach in accordance with the Act and their risk of discipline under the Rules are sufficient to afford standing, and the question of whether any portion of the Act should be spared from injunctive relief, if the plaintiffs succeed, is not yet before the court.

## B. *Pullman* Abstention

The "*Pullman* abstention doctrine"—named for *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 497 (1941)— "instructs courts to avoid exercising jurisdiction in cases involving an ambiguous state statute that may be interpreted by state courts so as to eliminate, or at least alter materially, the constitutional question raised in federal court." *Fowler v. Benson*, 924 F.3d 247, 255 (6th Cir. 2019).. The appellate courts have been clear, however, that *Pullman* abstention is an "extraordinary and narrow exception to the duty of a [d]istrict [c]ourt to adjudicate a controversy properly before it." *Jones v. Coleman*, 848 F.3d 744, 749 (6th Cir. 2017) (quoting *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959)).

Even if *Pullman* abstention were not an extraordinary step, however, the court would not have a basis for applying it here, because the issues that the plaintiffs have raised could not be resolved by waiting for further clarification by Tennessee courts. *Pullman* abstention might make

31

sense if the plaintiffs' claims depended on a discrete ambiguity that could plausibly be resolved in foreseeable state litigation. The Act, however, is "not open to one or a few interpretations, but to an indefinite number." *Baggett v. Bullitt*, 377 U.S. 360, 378 (1964). There is, therefore, no way that litigation in the Tennessee courts could be expected to resolve that underlying ambiguity. Even if Tennessee courts resolved dozens of cases related to the Act, there is little reason to think that it would change the core issue: that the language within the four corners of the Act simply does not set out a meaningful standard. The court, accordingly, has no basis for abstaining.

### C. Vagueness

"Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.'" *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (quoting *Lanzetta v. State of N.J.*, 306 U.S. 451, 452 (1939)). After all, laws are directives, and something can only be a directive if a person can actually understand it well enough to follow it. A law that cannot be understood "is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). That does not mean that a law has to be wise or perfect or crystal clear, but it must mean something concrete and specific that a well-informed person can understand by reading its text. In recognition of that basic principle, federal courts have long recognized that a law that does not define its prohibitions with at least some bare minimum of clarity is "repugnant to the due process clause of the Fourteenth Amendment." *Lanzetta*, 306 U.S. at 452.

Impermissibly vague laws "may take two forms, both of which result in a denial of due process." *Dambrot v. Cent. Michigan Univ.*, 55 F.3d 1177, 1183–84 (6th Cir. 1995) (quoting *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990)). The first form of

vagueness focuses on the lack of notice to the regulated party, who is entitled to be made aware of "the standard of conduct to which a citizen is held accountable." *Id.* The second, but closely related, facet of vagueness focuses on the power and discretion that a vague law grants an enforcing party. Legal specificity is also a form of legal restraint. Without specificity, a prohibition is simply an "unrestricted delegation of power, which in practice leaves the definition of its terms to law enforcement officers, and thereby invites arbitrary, discriminatory and overzealous enforcement." *Id.* Accordingly, to succeed on a vagueness challenge, a plaintiff typically must show that the relevant terms either "(1) 'fail[] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or (2) 'authorize or even encourage arbitrary and discriminatory enforcement.'" *Platt*, 894 F.3d at 246 (quoting *Hill*, 530 U.S. at 732).

The Supreme Court has been clear that the degree of vagueness permissible depends, to a significant degree, on the nature of the laws and rights at issue. For example, "'a more stringent vagueness test should apply' to laws abridging the freedom of speech . . . ." *Id.* (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 499, 503 (1982)). Similarly, laws that include criminal prohibitions typically require a higher level of specificity than purely civil laws. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99 ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). The Act is not a criminal statute, and the parties agree that, because the plaintiffs are public employees whose claims involve the performance of their duties, it is not a First Amendment case.[15] The Act and the Rules are, therefore, not subject to the most

---

[15] Although this case undeniably involves speech, the First Amendment typically permits the government to regulate the speech of public employees in the direct performance of their duties. *See Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). Because there are no student or parent plaintiffs, the court is not called on to consider whether, for example, the state's decision to offer a preferred route for curricular

stringent application of anti-vagueness principles. Nor, however, do those facts excuse the law altogether. As the Supreme Court has said, in no uncertain terms, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (collecting cases).

Given that it is possible for an ordinary civil law to be impermissibly vague, the Act—or, at least, a substantial portion of it—obviously poses that risk. Indeed, the defendants have not identified any enforceable prohibitory civil law, in Tennessee or any other U.S. jurisdiction, that is *less* clear in its directives than the Act. The defendants protest that difficult edge cases may arise under many statutes, and that does not render those statutes necessarily unconstitutional. That is true, but it is beside the point. As the Supreme Court has explained, "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine" whether a violation has occurred, "but rather the indeterminacy of precisely what" standard the law imposes for finding a violation in the first place. *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). The Court has recognized that that danger is particularly strong when a statute uses terms incorporating "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* (collecting cases). That is exactly what has happened here.

The Act does not simply use language that is sloppy or overly general; the entire Act is built around unrestrained appeals to abstract principles with contestable moral and political content—such that the practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it. Every or nearly every concept prohibited by the Act is poorly defined in that way, set out in language that might

---

grievances based on the political content of those grievances might violate the First Amendment or Equal Protection rights of students or parents with curricular complaints other than those privileged by the Act.

34

be at home in an angered blog post or an opinion column but which, when imported into a legal code, is manifestly unworkable. What, for example, does it mean to "promote" the concept that Tennessee or the United States is "fundamentally or irredeemably racist or sexist"? What is the difference between ascribing a trait to a nation/state and ascribing that trait to the nation/state's institutions, leaders, or history? What separates a "fundamental" trait from a non-fundamental one? What does it mean for such a flaw to be "irredeemable"? All of those issues arise before one even reaches the main event: the meaning of the terms "racist" and "sexist." Anyone who lives in the United States should know that one could fill a library with the disagreements about the meaning of those terms that happen in a single day.

The Supreme Court has recognized that these kinds of value-laden terms that maximize enforcement discretion can be a quick route to unconstitutional ambiguity—holding, for example, that it was unconstitutional for a criminal prohibition to depend on whether certain documents were, in the view of law enforcement, "credible and reliable." *Kolender v. Lawson*, 461 U.S. 352, 354 (1983). The term "unjust and unreasonable rate or charge in handling or dealing in or with any necessaries" was similarly found to impermissibly "leave[] open . . . the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921). The same problem doomed the State of Massachusetts' attempt to condition illegality on whether a defendant acted "contemptuously." *Smith v. Goguen*, 415 U.S. 566, 578 (1974). The government cannot simply tell people to "be good" and leave it up to the enforcers to decide what "good" is.

The Supreme Court has recognized the fact that, in some instances, laws that might seem vague on first reading can be understood, in context, to be "employ[ing] words or phrases having

a technical or other special meaning, well enough known to enable those within their reach to correctly apply them." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926) (collecting cases). The phrases used to define the concepts prohibited by the Act, however, present the opposite case: their vagueness becomes clearer and clearer the more one thinks or knows about them, and the argument that they are not vague can only come from a place of blinkered ignorance about the malleability of the concepts involved. There are undoubtedly people in Tennessee who think it is perfectly obvious what it means to suggest, improperly, that "[a] meritocracy is inherently racist or sexist," Tenn. Code Ann. § 49-6-1019(a)(7). Maybe everyone on those people's social media feeds shares their understanding. A law, though, is a law for everyone, and the Due Process Clause, therefore, calls on the court to consider what the language of the Act means in the real world, not simply what it might have meant in whatever bubble it emerged from. In the real world, whether a "meritocracy," when imposed on a world with preexisting racial and sex- or gender-based divisions, is "inherently racist" is not only a question with many potential answers, but with many potential ways of understanding the question in the first place. That open-ended contestability is a part of life and, indeed, part of the lifeblood of democracy. When it is made the foundation of a prohibitory statute, however, what results is an "impossibility of ascertaining, by any reasonable test, that the Legislature meant one thing rather than another." *Connally*, 269 U.S. at 394.

The vagueness of the prohibited concepts is made significantly worse by the Act's prohibition not merely on teaching the prohibited concepts, but also "including" or "promoting" them "as part of a course of instruction." Indeed, the word "promotes" has been specifically identified by the Supreme Court as "susceptible of multiple and wide-ranging meanings." *United States v. Williams*, 553 U.S. 285, 294 (2008). It might be fairly easy for any given teacher to

avoid outright saying that "[a]n individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex," Tenn. Code Ann. § 49-6-1019(a)(8). How, though, could any teacher accurately teach the role that race has played in America without potentially running afoul of allegations that he or she is "promoting" a particular view? The only protection that a teacher has from that ambiguity is the Act's safe harbors for "impartial" instruction. "Impartial," however, is one of the Act's *most* ambiguous terms, and the application of the Impartiality Clause itself depends, in some instances, on whether the history at issue is "controversial," Tenn. Code Ann. § 49-6-1019(b)(2)—a word that has also been flagged by the appellate courts as highly problematic from a vagueness standpoint. *See United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998).

Indeed, Representative Ragan's explanation of the term to the General Assembly provides a clear example of how undefined the concept of impartiality can be. Representative Ragan asserted that "[i]mpartially means without favor to one side or another, you may use the term 'balanced' if you choose." (Doc. No. 1. ¶ 114.[16]) Representative Ragan was then pressed, however, regarding how a teacher could be expected to apply that standard to instruction regarding particular historical atrocities, like the Holocaust. Representative Ragan struggled to respond and ultimately conceded that "there's no other way to describe" certain historical events other than "reprehensible." *Id.*[17] Representative Ragan's concession, however, is also an acknowledgment that the kind of impartiality he envisions is impossible, even on issues where people agree. How, then, is the concept to be applied to historical events on which people do not

---

[16] May 3, 2021 Education Committee Debate at 20:39.

[17] May 3, 2021 Education Committee Debate at 23:00.

agree? Who decides which historical events are reprehensible enough to be acknowledged as such?

The Impartiality Clause, moreover, is expressly limited to protecting discussions of "history" or "historical" events, Tenn. Code Ann. § 49-6-1019(b), and, while history may be the subject most obviously implicated by the Act, it is not the only one. The individual plaintiffs' allegations suggest that issues are certain to arise with regard to selections of reading materials used in connection with language instruction, and, as plaintiff Stein explained with regard to young adult novels, those concerns may depend on the materials' treatment of the world of today, not merely the past. The State Board's academic standards, moreover, explicitly provide for the discussion of contemporary issues, as well as topics, like economics, that apply to the modern world. *See Social Studies Standards* at 144–54. Insofar as the Impartiality Clause provides any meaningful protection at all, it does not extend that protection to discussions about the present.

The Act, however, leaves it entirely up to the Commissioner to determine—unilaterally and with little, if any, constraint—whether a teacher has appropriately navigated any issues that arise. By vesting interpretive authority regarding such open-ended terms in the Commissioner, the Act does not so much forbid teachers from suggesting that, for example, Americans are not created equal, so much as it forbids teachers from suggesting that Americans are not created equal *as the Commissioner understands that concept*—an understanding that the Commissioner does not have to share with the public until after a school district—and, potentially, a teacher—face enforcement. The same is true for what it means to be "impartial" in recounting the history of racial injustice in the United States, what it means to suggest that "[a]n individual, by virtue of the individual's race or sex, is inherently privileged," or whether a description of the details of

38

the justice system suggests that "the rule of law does not exist." The Act simply invites a vast array of potentially dissatisfied individuals to lodge complaints based on their understanding of those concepts and then calls on the Commissioner, as a sort of state philosopher, to think deeply about what equality, impartiality, and other abstract concepts *really mean* and enforce the Act accordingly. But "[s]tatutory language of such a standardless sweep" that it leaves individuals at the mercy of the "personal predilections" of authorities is exactly what the doctrine of unconstitutional vagueness is intended to guard against. *Smith*, 415 U.S. at 575.

The problem, it bears stressing, is not that any public school teacher needs to tell his or her students that, for example, "[a]n individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex," Tenn. Code Ann. § 49-6-1019(6). It is perfectly within the rights of the state of Tennessee to instruct its teachers not to render that kind of express judgment as part of instruction, just as it is within the state's rights to require teachers not to give short shrift to the role of racial oppression in American history— as, in fact, the General Assembly has done, by requiring the State Board's "standards recommendation committee [to] include events of the Civil Rights Movement during the period from 1954 to 1968 in the committee's final recommendation of academic standards in the subject of social studies for students in grades nine through twelve." Tenn. Code Ann. § 49-1-308. The problem is that the language and structure of the Act and Rules leave LEAs and teachers sandwiched between two sources of essentially unbounded discretion. First, any one complainant can conclude, based on the ambiguous language of the Act, that an instance of instruction is improperly promoting one of the Act's forbidden concepts, as that single complainant understands them. Then, after the school and the teacher have been put through the Rules' demanding investigatory process, the final verdict is rendered by the Commissioner, based on

nothing other than her understanding of the same ambiguous language that invited the initial complaint.

The defendants, lacking any kind of plausible argument that the Act is *not* vague, place a great deal of weight on the fact that the Supreme Court has suggested that a court can find a law impermissibly vague, on its face, "only if the enactment is impermissibly vague in all of its applications*." Vill. of Hoffman Ests.*, 455 U.S. at 495. That language, taken in isolation, can make the Supreme Court's approach seem less like a legal test and more like a parlor game where a defendant can prevail against a facial challenge as long as he can concoct some hypothetical—any hypothetical—in which even a single act would be clearly prohibited by the statute. Indeed, that is exactly the approach that the defendants have taken, choosing to devote much of their substantive briefing not to a serious grappling with the broader body of caselaw governing vagueness challenges, but rather to a simplistic exercise of manufacturing supposedly unproblematic applications of each key provision of the Act. For example, an ordinary layperson might read the Act's prohibition on "[p]romoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people" and find that language to be, on its face, strikingly vague. The defendants, however, suggest that the court should—and indeed must—ignore that vagueness because, if nothing else, the provision clearly bars teaching "certain material from the Ku Klux Klan or Nation of Islam." (Doc. No. 42 at 14.) The patent vagueness of the statute—and its obvious potential implications for countless pedagogical decisions—are, the defendants suggest, simply beside the point in a facial challenge, as long as a defendant can check the box of identifying *something* that the law clearly forbids.

The Supreme Court, however, expressly rejected that approach in *Johnson v. United States*, 576 U.S. 591 (2015), clarifying that, "although statements in some of our opinions could

be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Id.* at 602. Indeed, even before the Supreme Court clarified matters, it had already urged that its standards for vagueness are not to be "mechanically applied." *Vill. of Hoffman Ests.*, 455 U.S. at 503. There is a very good reason for that: if the test actually worked the way that the defendants imagine, it would actually reward vague laws, not limit them. Imagine, for example, that the General Assembly had decided to make the Act even less clear and chosen to adopt a single prohibition: "No teacher shall teach any material that is disreputable." Such a command would be undeniably vague—indeed, so vague that a holding finding it permissible would be little more than a repudiation of the doctrine of vagueness altogether. Is there any doubt, though, that such a hypothetical prohibition could pass the defendants' proposed test? It would, for example, run afoul of that prohibition to teach children to commit insurance fraud. As the defendants would have it, that would end the inquiry: the law is permissibly definite to survive a facial challenge, and if a teacher has trouble understanding the law's terms, that is just too bad: it clearly forbids teaching students to burn their own houses down for money, and that is enough.

It is little wonder, then, that the Supreme Court has disavowed that way of considering vagueness challenges. The defendants urge the court to disregard that disavowal as merely a "musing" that, insofar as it has any force at all, is limited to the "unique concerns presented by" the statute at issue in that case, the Armed Career Criminal Act, and statutes involving similar language. (Doc. No. 48 at 4.) The Supreme Court was clear, however, that it was not simply offering an abstract critique of the proposed test in a single setting, but pointing out that a review of the Court's own caselaw refutes any contention that such a test has ever actually applied. Accordingly, whether the Supreme Court was "musing" or not, any court or litigant can simply

turn to the caselaw and see, for themselves, what approach has historically been applied to accusations of unconstitutional vagueness. Such a review confirms the Supreme Court's characterization.

For example, in *Kolender v. Lawson*, the Supreme Court considered "an attack on the facial validity" of a "statute that require[d] persons who loiter or wander on the streets to provide a 'credible and reliable' identification" in certain situations. *Kolender*, 461 U.S. at 353. Under the approach that the defendants suggest governs facial challenges, the plaintiff in *Kolender* unambiguously should have lost, because it is easy to imagine at least one course of action that would be clearly prohibited by such a statute. For example, the statute would clearly be violated if the accused loiterer presented a form of identification handwritten on the back of a hamburger wrapper. If the defendants are right about how facial challenges work, then that should have ended the inquiry.

It did not. Indeed, the Supreme Court did not even devote an instant to the kind of one-clear-application-is-enough analysis that the defendants suggest now constricts every facial challenge like a vise. Rather, the Supreme Court considered the plaintiffs' arguments pursuant to the Court's ordinary caselaw on vagueness and ruled in favor of the plaintiffs—and, in fact, did so while citing to the very case from which the defendants have drawn their supposedly applicable test, *Village of Hoffman Estates*, which the Supreme Court had resolved just a year earlier. *Kolender*, 461 U.S. at 358. Someone, then, misunderstood *Village of Hoffman Estates*— either the Supreme Court, both right after it was decided and then, again, decades later, when it decided *Johnson*—or these defendants. The structure of the federal judicial system requires this court to conclude that the error is the defendants', but the court would reach the same conclusion regardless.

42

Even the cases that the defendants cite in their own briefing as supposed examples of their preferred approach at the Sixth Circuit level are, in fact, examples of courts acting otherwise. For example, the defendants suggest that their preferred test was applied in *Green Party of Tennessee v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012). (Doc. No. 48 at 3.) The Sixth Circuit's analysis in *Green Party*, however, looks nothing like the defendants would propose. The Sixth Circuit, in that case, was called on to determine whether the phrase "a petition which shall conform to requirements established by the coordinator of elections but which must at a minimum bear the signatures of [an adequate number of] voters" was impermissibly vague with regard to whether the commissioner of elections had the authority to impose additional substantive requirements and, if so, what the extent of that authority was. According to the defendants' approach, the Sixth Circuit should have simply considered whether there was a single conceivable situation in which the law's application was clear—for example, one in which the commissioner of elections simply imposed no new requirements, whether he had the power to do so or not—and rejected the vagueness challenge on that basis.

The Sixth Circuit, however, did not consider the matter in that way at all. Rather, it rejected the vagueness challenge because the relevant language could "reasonably be read as giving the coordinator of elections the discretion to create requirements addressing only the petition's form, not to create substantive requirements affecting, for example, the time allowed for collecting signatures or the number of signatures required on the petition." *Id.* The court explained that, "because the statute [could] reasonably be construed in this way," the court was required to adopt that reasonable construction for the purposes of the plaintiffs' challenge. In other words, the issue was not, as the defendants would have it, whether there was some plausible action that would clearly fall within the law challenged as ambiguous, but whether

43

there was some way to construe the law that eliminated the ambiguity. When *Village of Hoffman Estates* talked about whether a challenged law would be "impermissibly vague in all of its applications," that is what it meant—not whether the challenged law could ever clearly apply to *something*, but whether there was any reasonable understanding of the law that rendered it no longer impermissibly vague.

Such an analysis would not support the defendants' argument in this case, however, because there is no reasonable interpretation of the Act's language that would resolve the problem of its vagueness. The abstract terms at issue are fundamentally indeterminate in a way that cannot be eliminated simply by reading into them some implicit limitation or construing a particular term in a more, rather than less, definite way. There is no way to take the vagueness out of the concepts of "promoting division" or presenting historical events in an "impartial" manner. There is no way to take the vagueness out of an edict to discuss American history, but not in a way that "promotes" the "concept" that "an individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex." There is, in short, no "application" of this law that would fix what is wrong with it.

Even aside from the fact that the defendants seem to have misunderstood the applicable test for facial challenges, their single-minded reliance on the facial/as-applied distinction to avoid grappling with the Act's overall flaws cannot be squared with the way that distinction actually applies in this case. As the defendants would have it, every constitutional challenge must be shoved into one of two rigid boxes, each of which brings with it a substantial obstacle to a plaintiff's prevailing. A plaintiff can file a facial challenge, in which case the plaintiff can challenge the fundamental flaws of a statute, but he must do so pursuant to a drastically watered down version of the relevant substantive doctrines—a kind of Constitution Lite. In the

alternative, the plaintiff can avail himself of the full protection of the Constitution by filing an as-applied challenge, but, if he does so, he must limit his challenge in the narrowest possible way to the precise details of specific conflicts that have been or, with certainty, will be subject to actual enforcement actions. Maybe, for some laws and under some facts, § 1983 does work that way. The problem with importing such an approach to a case such as this, however, is that it wholly disregards the way that these laws are actually "applied" to the plaintiffs.

For example, the defendants appeal to the principle that a plaintiff challenging a civil statute outside of the First Amendment context only "has standing to challenge [a law's] purported vagueness as applied to the facts of her case." *Johnson v. Morales*, 946 F.3d 911, 928–29 (6th Cir. 2020) (citations omitted). But the facts of the case, in this instance, are that each plaintiff must try, every working day, not to include something that could be shoehorned into one of the Act's undefined concepts. The Act does not merely constrict them in a few ways, but pervasively, especially for plaintiffs, like some of these, with a continuing obligation to identify supplemental student reading materials. Therefore, a challenge to the Act's comprehensive unworkability *is* a challenge limited to the facts of each plaintiff's case. Even if one accepted the defendants' argument that laws challenged on their face are subject to a significantly more forgiving due process requirement, it would not save the defendants from having to contend with the actual, full demands of due process, with regard to the Act as a whole, in the context of the plaintiffs' as-applied arguments.

All that is left to the defendants, then, is their argument that, even if this Act would be unconstitutional under the standards applicable in most vagueness cases, the court should nevertheless dismiss the plaintiffs' claims because the Act, as a civil statute that does not bear directly on the First Amendment or another federal constitutional right other than the right to due

45

process, is entitled to the lowest possible standards of specificity.[18] The strongest version of the defendants' argument, which they advance in parts of their briefing, is that no facial challenge to a civil statute without First Amendment implications can proceed at all. That argument, however, is affirmatively foreclosed by *Sessions v. Dimaya*, 584 U.S. 148, 174 (2018), in which the Supreme Court upheld just such a challenge. The defendants, therefore, must rely on the alternative argument that, while such challenges are technically permitted, the standards governing them are so forgiving to the government that the plaintiffs cannot succeed.

That argument fails for at least two reasons. First, as the court has already noted, there is a difference between low standards and no standards, and, if it is ever possible for a civil law to be unconstitutionally vague outside of the First Amendment context, then the Act would be as fitting a candidate for such a holding as one could reasonably expect to find. The Act is so extremely vague that, if the bar against unconstitutionally vague statutes would not permit the plaintiffs' claims to at least survive a motion to dismiss, then that bar would mean, effectively, nothing.

More importantly, however, the defendants' approach again fails to account for the complexities of the actual caselaw. It is not, in fact, the case that the standard of vagueness applicable to a statute is defined solely by the two considerations of (1) whether the law is civil or criminal and (2) whether it bears on the right to free speech or a comparable constitutional right (other than the right to due process, which is, by definition, implicated in all vagueness cases). Although the defendants are correct that "[t]he degree of vagueness that the Constitution

---

[18] The defendants also point out that less specificity is required for laws with scienter requirements, *see Gonzales v. Carhart*, 550 U.S. 124, 149 (2007), which the Act and Rules arguably do have. As the defendants point out, however, the plain language of the relevant provisions can be read as merely requiring that the educator acted "affirmatively and intentionally" in including the relevant material, not that the educator had any idea that the material would ultimately be found to violate the Act. *See* Tenn. Comp. R. & Regs. 0520-12-04-.05(8)(b). Insofar as that scienter requirement provides support for the defendants' position, then, it is limited.

46

tolerates . . . depends in part on the nature of the enactment," *Vill. of Hoffman Ests.*, 455 U.S. at 498, they overlook the fact that the Supreme Court has, over its many years of considering these issues, acknowledged an array of factors that bear on the amount of specificity required for a law. Once one broadens one's consideration to these other factors, it becomes clear that the Act and the Rules are not, in fact, entitled to consideration under the most forgiving conceivable standard.

For example, the court is permitted to consider whether a challenged law, in practice, "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.'" *Papachristou*, 405 U.S. at 170 (quoting *Thornhill v. State of Alabama*, 310 U.S. 88, 97 (1940)); *cf. Trump v. Hawaii*, 585 U.S. 667, 705 (2018) (noting that even the highly deferential "rational basis" review standard permits a court to consider whether a law was improperly enacted out of a "bare . . . desire to harm a politically unpopular group.") (quoting *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). One need look no further than the statements of Representative Ragan to see that the Act appears, at least for some legislators, to have been motivated more by a desire to purge "subversive" political undesirables from the educational workforce than improve Tennessee's educational standards. Whatever individual legislators thought, moreover, there is little doubt that potential complainants will view the Act that way. That obvious, unusually high risk of improper considerations in enforcement belies any suggestion that the Act is anywhere near the most innocuous type of law from a vagueness standpoint.

It also matters whether a law involves situations that might require enforcement officials to make "an on-the-spot assessment of the need to keep order," *Smith*, 415 U.S. at 581, which the Act does not. For some such laws, a degree of vagueness is a necessity, because it allows leeway

for rapid decisionmaking in situations that leave no other choice, such as in physically dangerous public disturbances. Tennessee's careful, deliberate process that governs every other curricular decision confirms that this is not such a case. A parent incensed that their child read a novel depicting racism is not the same thing as a first responder arriving at a riot. Indeed, if there is anyone called on, by the relevant laws, to make difficult, on-the-spot decisions based on unforeseeable circumstances, it is the regulated teachers, not complainants or the Commissioner. It is difficult to see, then, why the teachers' discretion is what should be sacrificed.

The Supreme Court has further acknowledged that less specificity is demanded of "economic regulation," because "businesses, which face economic demands to plan behavior carefully," can be expected to navigate ambiguity comparatively well. *Vill. of Hoffman Ests.*, 455 U.S. at 498 (collecting cases). LEAs, however, are not businesses, and teachers are not profit-maximizing entrepreneurs. While the plaintiffs' status as public servants may spare the defendants the hazard of having to contend with the First Amendment in governing their speech on the job, it is also a ground for concluding that the Act is not, in fact, of the type least requiring of specificity.

Finally, it matters that the law, though not criminal, is potentially punitive, both toward LEAs and, through its reliance on teacher disciplinary measures and the threat of lost licensure, teachers. The law at issue in *Village of Hoffman Estates* was, itself, merely a commercial licensure ordinance that "nominally impose[d] only civil penalties." *Vill. of Hoffman Ests.*, 455 U.S. at 499. The Supreme Court recognized, however, that a civil law with a "prohibitory and stigmatizing effect may warrant a relatively strict test."[19] *Id.* The Act, similarly, is prohibitory, and its stigmatizing effect is both obvious and demonstrated by its still-short history on the

---

[19] The defendant in *Village of Hoffman Estates* conceded the quasi-criminal nature of the ordinance at issue, but the Supreme Court nevertheless addressed the matter and echoed that conclusion. *Vill. of Hoffman Ests.*, 455 U.S. at 499.

48

books. Indeed, *Village of Hoffman Estates* involved only the stigma of being labeled a lawful seller of drug paraphernalia. *See id.* at 499 n.16. It is, suffice it to say, not obviously preferable to be considered a subversive Tennessee teacher in the age of social media.

There is, of course, no way to remove ambiguity from the task of running an educational system. Teaching a diverse student population about a complex world may, at times, call for relatively open-ended standards. The inescapability of such challenges, however, is precisely why the Supreme Court has placed an emphasis on considering vagueness with an eye toward the specific enforcement and implementation mechanisms at issue. The State Board's ordinary academic standards include any number of statements that could be criticized as vague. The plaintiffs, however, do not complain that those standards are unconstitutional, because they are not enforced through a system of privately initiated inquisitions with the capacity to result in severe punishments. Rather, educators, administrators, and state-level policymakers can navigate the ambiguities of Tennessee's curriculum together, as part of the ongoing, collaborative process of actually operating a school system.

There is nothing inherently wrong with applying curriculum standards surrounding controversial topics. The state of Tennessee has, has always had, and will continue to have, tools that permit it to do so. It uses those tools already on countless topics, from how students will learn math, to what language skills they should develop, to what qualifies as established science worthy of being taught in schools. What the state of Tennessee did here, however, was to bypass those ordinary tools altogether in favor of a parallel system, applicable only to a handpicked set of political viewpoints, that sacrifices collaboration and workability in favor of ideological combat. All that the plaintiffs have asked is that, if the state of Tennessee chooses that route, it should at least do so clearly enough that educators can have some bare minimum of notice

regarding what it takes to actually steer clear of violating the Act and some bare minimum of restraint on the Commissioner's power to impose her views on the students and teachers of the state. The Constitution grants them the right to expect that, and § 1983 grants them the right to ask a court to enforce that expectation. There is, therefore, no basis for dismissal.

## V. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 41) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge