# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE EDUCATION ASSOCIATION, KATHRYN VAUGHN, ROLAND WILSON, MICHAEL STEIN, REBECCA DICKENSON, and MARY MCINTOSH,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:23-cv-00751** |
| | ) | **Judge Aleta A. Trauger** |
| **LIZZETTE GONZALEZ REYNOLDS, in her official capacity as Commissioner of the Tennessee Department of Education; and, in their official capacities as members of the Tennessee State Board of Education: KRISSI McINTURFF, JORDAN MOLLENHOUR, ROBERT EBY, WARREN WELLS, RYAN HOLT, LILLIAN HARTGROVE, NATE MORROW, LARRY JENSEN, DARRELL COBBINS, and BOB SMITH,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM

In this lawsuit, the plaintiffs—the Tennessee Education Association ("TEA") and five licensed Tennessee public school teachers, three of whom are TEA members—state a single cause of action under 42 U.S.C. § 1983, asserting that a state law and its implementing regulations are unconstitutionally vague, both facially and as applied, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. (Complaint, Doc. No. 1 ¶ 120.) The defendants—the Commissioner of the Tennessee Department of Education ("TDOE") and the members of the Tennessee State Board of Education ("SBOE"), all sued in their official capacity—

are the officials tasked with implementing the challenged law or imposing discipline for violations thereof.

Now before the court are cross Motions for Summary Judgment, each supported by a Memorandum of Law and each raising essentially the same issues but asserting that they should, as a matter of law, be resolved in the moving party's favor. (Doc. Nos. 80, 81 (Defs.' Motion and Memorandum), 83, 84 (Pls.' Motion and Memorandum).) Each party has filed its own Statement of Undisputed Material Fact, a Response in opposition to the opposing party's motion, a Response to the opposing party's Statement of Undisputed Material Fact, a Reply brief in further support of its own motion, and the evidentiary material each party relies on in support of its position. (Doc. Nos. 80-1 through 80-11, 82, 85, 86 (and attached exhibits) 88–91, 92 (and attached exhibits), 93, 94.)

The basic facts are undisputed, and the questions raised are purely questions of law. For the reasons set forth herein, the court finds that the plaintiffs have failed to establish standing to bring suit. Accordingly, the court will grant the defendants' motion, deny the plaintiffs', and dismiss this case without prejudice for lack of subject matter jurisdiction.

## I.      STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Ferro Corp. v. Cookson Grp., PLC*, 585 F.3d 946, 949 (6th Cir. 2009); *Taft Broad. Co. v. United States*, 929 F.2d 240, 241 (6th Cir. 1991). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft*, 929 F.2d at 248.

## II.     FACTS AND PROCEDURAL HISTORY

Ordinarily, in addressing dueling motions for summary judgment, the court considers each motion independently, viewing the material facts on which the party whose motion is under review relies, but in the light most favorable to the non-moving party. Here, there are no material factual disputes raised in connection with either party's motion—the parties simply emphasize different facts and draw diametrically opposed legal conclusions from what amounts to the same set of facts.

### A.     The Ban

In 2021, the Tennessee legislature enacted Tenn. Code Ann. § 49-6-1019 (the "Act"), which became effective on May 26, 2021. In November 2021, the TDOE promulgated emergency rules to effectuate the Act. A permanent version of the rules became effective on August 10, 2022. (Tenn. Comp. R. & Regs. 0520-12-04-.01 through -.08 ("the Rules"; together with the Act, the "Ban")).

The Act itself states, in full, as follows:

(a) An LEA or public charter school shall not include or promote the following concepts as part of a course of instruction or in a curriculum or instructional program, or allow teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include or promote the following concepts:

(1) One (1) race or sex is inherently superior to another race or sex;

(2) An individual, by virtue of the individual's race or sex, is inherently privileged, racist, sexist, or oppressive, whether consciously or subconsciously;

(3) An individual should be discriminated against or receive adverse treatment because of the individual's race or sex;

(4) An individual's moral character is determined by the individual's race or sex;

(5) An individual, by virtue of the individual's race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(6) An individual should feel discomfort, guilt, anguish, or another form of psychological distress solely because of the individual's race or sex;

(7) A meritocracy is inherently racist or sexist, or designed by a particular race or sex to oppress members of another race or sex;

(8) This state or the United States is fundamentally or irredeemably racist or sexist;

(9) Promoting or advocating the violent overthrow of the United States government;

(10) Promoting division between, or resentment of, a race, sex, religion, creed, nonviolent political affiliation, social class, or class of people;

(11) Ascribing character traits, values, moral or ethical codes, privileges, or beliefs to a race or sex, or to an individual because of the individual's race or sex;

(12) The rule of law does not exist, but instead is a series of power relationships and struggles among racial or other groups;

(13) All Americans are not created equal and are not endowed by their Creator with certain unalienable rights, including, life, liberty, and the pursuit of happiness; or

(14) Governments should deny to any person within the government's jurisdiction the equal protection of the law.

(b) Notwithstanding subsection (a), this section does not prohibit an LEA or public charter school from including, as part of a course of instruction or in a curriculum or instructional program, or from allowing teachers or other employees of the LEA or public charter school to use supplemental instructional materials that include:

(1) The history of an ethnic group, as described in textbooks and instructional materials adopted in accordance with part 22 of this chapter;

(2) The impartial discussion of controversial aspects of history;

(3) The impartial instruction on the historical oppression of a particular group of people based on race, ethnicity, class, nationality, religion, or geographic region; or

(4) Historical documents relevant to subdivisions (b)(1)-(3) that are permitted under § 49-6-1011.

(c) If the commissioner of education finds that an LEA or public charter school knowingly violated this section, then the commissioner shall withhold state funds, in an amount determined by the commissioner, from the LEA or public charter school until the LEA or public charter school provides evidence to the commissioner that the LEA or public charter school is no longer in violation of this section.

Tenn. Code Ann. § 49-6-1019. Subsection (a) of the Act embodies what the parties refer to as the

"Prohibited Concepts Ban."[1] *See also* Tenn. Comp. R. & Regs. 0520-12-04-.03(1)(a)–(n).

---

[1] The Ban clearly drew much of its language from an executive order issued by President Donald Trump during his first term, purportedly "Combating Race and Sex Stereotyping." *See* Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 28, 2020), *revoked by* Exec. Order No. 13985, 86 Fed. Reg. 7009 (Jan. 25, 2021). After President Biden revoked President Trump's executive order, numerous states in addition to Tennessee passed similar bans. *See, e.g.*, Ariz. Rev. Stat. § 15-717.02 (effective Sept. 29, 2021) (prohibiting any "teacher, administrator, or other employee of a school district [from] us[ing] public monies for instruction that presents any form of blame or judgement on the basis of race, ethnicity or sex," banning teachers from teaching concepts similar to Tennessee's Prohibited Concepts, and providing that any teacher who violates the section could be disciplined, including through the suspension or revocation of the teacher's certificate); Ark. Code Ann. § 6-16-156 (effective March 8, 2023) (prohibiting "indoctrination" by public school teachers or guest speakers, defined to include teaching the concept of "critical race theory"); Fla. Stat. Ann. § 1000.05(4) (effective July 1, 2024) (similar prohibited concepts law that extends not only to K-12 instruction but to state colleges as well); Ga. Code Ann. § 20-1-11 (effective July 1, 2022) (prohibiting the teaching of "divisive concepts"); Idaho Code § 33-138(3) (effective April 28, 2021) (prohibiting schools from "direct[ing] or otherwise compel[ling]" students to adopt the belief, among others, "[t]hat individuals, by virtue of sex, race, ethnicity, religion, color, or national origin, are inherently responsible for actions committed in the past by other members of the same sex, race, ethnicity, religion, color, or national origin"); Iowa Code § 261H.8 (effective July 1, 2021) (prohibiting instruction of "specific defined concepts," including concepts similar to Tennessee's Prohibited Concepts, but specifically stating the prohibition should not be construed to violate the First Amendment rights of student or faculty, prevent the promotion of "racial, cultural, ethnic, intellectual [and] academic diversity or inclusiveness," or "prohibit discussing specific defined concepts as part of a larger course of academic instruction"); Miss. Code Ann. § 37-13-2 (effective March 14, 2022) (prohibiting the teaching of critical race theory); N.H. Rev. Stat. Ann. § 193:40 (effective June 25, 2021) (prohibiting teachers from teaching or compelling

students to express support for listed concepts; providing that any "person claiming to be aggrieved by a violation of this section, including the attorney general, may initiate a civil action against a school or school district" and that violation of the statute by a teacher would "justif[y] disciplinary sanction"); N.D. Cent. Code Ann. § 15.1-21-05.1 (effective July 1, 2023) (barring public schools from teaching "critical race theory" and defining "critical race theory" to mean "the theory that racism is not merely the product of learned individual bias or prejudice, but that racism is systemically embedded in American society and the American legal system to facilitate racial inequality"); Okla. Stat. Ann. tit. 70, § 24-157 (effective July 1, 2021) (providing that no student of an Oklahoma public higher education institution "shall be required to engage in . . . mandatory gender or sexual diversity training or counseling" and barring teachers, administrators, and employees of public schools from teaching eight prohibited concepts); Tex. Educ. Code § 28.0022 (a)(4)(A) (effective Dec. 2 2021) (barring teachers, administrators and other school district employees from teaching eight specified prohibited concepts, similar to those in Tennessee's law); Utah Code Ann. § 53G-10-206 (effective May 1, 2024) (requiring that curricular materials be "consistent" with certain "principles of individual freedom"); and Wyo. Stat. § 9-25-101 (effective July 1, 2025) (prohibiting any "governmental entity" from engaging in "any diversity, equity or inclusion program, activity or policy" or in "institutional discrimination").

Some of these statutes have been challenged, with varying degrees of success. *See, e.g.*, *Ariz. Sch. Bds. Ass'n, Inc. v. State*, 501 P.3d 731, 734 (Ariz. 2022) (finding the plaintiffs had standing under state law and that Ariz. Rev. Stat. § 15-717.02 violated the Arizona Constitution's "title requirement" or "single subject rule"); *Walls v. Sanders*, No. 4:24-cv-00270-LPR, 2024 WL 5192031, at *32 (E.D. Ark. Dec. 20, 2024) (granting the defendants' motion to dismiss facial equal protection claims and holding the remainder of the motion to dismiss in abeyance, pending a ruling by the Eighth Circuit); *Black Emergency Response Team v. Drummond*, 737 F. Supp. 3d 1136, 1147 (W.D. Okla. 2024) (granting preliminary injunction barring enforcement of parts of a similar prohibited concepts law), *appeal docketed*, No. 24-6141 (10th Cir. July 16, 2024); *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *18 (D.N.H. May 28, 2024) (finding N.H. Rev. Stat. Ann. § 193:40 facially unconstitutional but without being called upon to address standing), appeal docketed, No. 24-1690 (1st Cir. July 26, 2024).

In *Pernell v. Florida Board of Governors*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022), *appeals docketed*, Nos. 22-13992, 22-13994 (11th Cir. Nov. 30, 2022), the plaintiffs were state university professors and students who sued members of state universities' boards of trustees and the state university board of governors in their official capacity, asserting First and Fourteenth Amendment challenges to the so-called "Individual Freedom Act" (IFA), Fla. Stat. Ann. § 1000.05(4), and its implementing regulations. The court granted in part the plaintiffs' motion for preliminary injunction, based on their establishing a substantial likelihood of success on both their First Amendment and Fourteenth Amendment vagueness claims. Before addressing the merits of the motion, the court first determined that all but one of the professor plaintiffs had standing to bring their First and Fourteenth Amendment claims, employing a substantially less restrictive standard than that required by the Sixth Circuit, as discussed herein. Specifically, the court found that, "[f]or a [Fourteenth Amendment] vagueness claim that allegedly chills speech," as with a First Amendment claim, the plaintiff only needed to show that "(1) he seriously wishes to speak; (2) such speech would arguably be affected by the challenged prohibition, but the rules are at least arguably vague as they apply to him; and (3) there is *at least a minimal probability that the rules will be enforced if they are violated.*" *Id.* at 1266 (emphasis added) (citing *Harrell v. The Fla. Bar*,

Subsection (b) is the "Safe Harbor Provision." *See also id.* 0520-12-04-.03(2). Neither the Act nor the Rules define the following terms: "include," "promote," "racist," "sexist," "oppressive," "meritocracy," "fundamentally," "irredeemably," "ethnic group," "impartial," "controversial," or "aspects of history." *See* Tenn. Code Ann. § 49-6-1019; Tenn. Comp. R. & Regs. 0520-12-04-.02.

Under the Rules, an "eligible complainant" is any current student, parent of a current student, or current employee of the local education agency ("LEA") or public charter school in which the Ban was allegedly violated. Tenn. Comp. R. & Regs. 0520-12-04-.02(6)). Any "eligible complainant" can file a complaint against a teacher for violation of Ban. Tenn. Comp. R. & Regs. 0520-12-04-.05(2), (3). The complaint must be filed "with the LEA or public charter school in which the allegation(s) arose," within forty-five days of the "Prohibited Concept['s] being included or promoted in a course of instruction, curriculum and instructional program, or supplemental instructional materials." Tenn. Comp. R. & Regs. 0520-12-04-.05(2), (4).

Within sixty days of receiving a timely complaint by an eligible complainant alleging a violation of the Prohibited Concepts Ban, the LEA or public charter school must investigate the complaint, determine whether the complaint is substantiated, issue a written opinion stating the result of the investigation, and communicate that decision to the complainant and the accused individual. Tenn. Comp. R. & Regs. 0520-12-04-.05(6), (8), (9).[2] A complaint will be deemed substantiated if an educator "affirmatively and intentionally included or promoted [a Prohibited Concept] in a course of instruction, curriculum and instructional program, or supplemental instructional materials." Tenn. Comp. R. & Regs. 0520-12-04-.05(8)(a)–(b).

---

608 F.3d 1241, 1254 (11th Cir. 2010)). The court finds that the factual circumstances at issue and the legal standards applied in *Pernell* are so dissimilar to those here that *Pernell* has little bearing on this court's analysis.

[2] The Rules also provide for early resolution of complaints through a collaborative process resulting in a resolution agreement. *See* Tenn. Comp. R. & Regs. 0520-12-04-.06.

The teacher or complainant may appeal an adverse decision from an LEA or public charter school to the TDOE. Tenn. Comp. R. & Regs. 0520-12-04-.07(1). Upon receipt of a timely appeal, a TDOE "review team" must review a complaint and prepare a report for the TDOE Commissioner. Tenn. Comp. R. & Regs. 0520-12-04-.07(2)–(7). Once the Commissioner receives such a report, the Commissioner must determine whether to uphold or reverse the decision made by the LEA or public charter school. Tenn. Comp. R. & Regs. 0520-12-04-.07(8).

Under the Rules, a teacher who is found to have violated the Ban may face disciplinary action, in accordance with SBOE Rule 0520-02-03-.09. Tenn. Comp. R. & Regs. 0520-12-04-.05(10)(b). SBOE Rule 0520-02-03-.09(3) provides that the SBOE may discipline teachers, including through formal reprimands or by "revok[ing], suspend[ing], . . . or refus[ing] to issue or renew an educator's license" on a number of grounds, including "good cause." *See also* Tenn. Code Ann. § 49-1-302(a)(5)(A)(iv) (authorizing the SBOE to adopt "rules and policies governing . . . [d]iscipline of licensed personnel for misconduct by formal reprimand or by the suspension and revocation of licenses and certificates"). Neither the Act nor the Rules provide for legal representation for teachers subject to enforcement proceedings.

## B.    Complaints About Violations of the Ban[3]

As of the filing of the Motions for Summary Judgment in March 2025, the TDOE has considered three appeals of local decisions addressing complaints about violations of the Ban: (1) Appeal 22-1, filed by David Coleman against Blount County Schools on February 28, 2022; (2) Appeal 22-2, filed by Ferahewot Eshetu against Lighthouse Christian School on November 6, 2022, and (3) Appeal 23-1, filed by Gray Clawson against Germantown Municipal School District

---

[3] The facts set forth herein for which no citations are provided are drawn from the parties' Responses to the opposing party's Statement of Undisputed Material Facts and are undisputed.

on March 19, 2023. (*See* Doc. No. 86-8 at 5 (TDOE Commissioner's Answer to Pls.' Interrog. No. 3).) These appeals did not involve any of the plaintiffs, and none resulted in discipline to the affected teacher.

From May 2021 through February 18, 2025, the SBOE has not received reports from LEAs or public charter schools about any violation of the Ban by a teacher. The SBOE has not taken an adverse action against any teacher's license for violating the Ban from May 2021 through February 18, 2025.

In addition to the three appeals, members of the public have also contacted TDOE and/or school districts about alleged violations of the Act. State legislators have contacted TDOE to assert that the Act is being violated and to request that TDOE investigate. The plaintiffs state that, during discovery, they received documents from just three of Tennessee's 140 school districts, and these documents revealed additional complaints submitted to LEAs. (*See* Doc. Nos. 86-39 through 86-45, 86-69.) Since the enactment of the Ban, TDOE has received communications from members of the public calling for teachers to be disciplined if they violate the Ban, and some of these communications have included requests for termination or revocation of certain teachers' teaching licenses. (*See, e.g.*, Doc. Nos. 86-47, 86-49 through 86-52.)

Neither TDOE nor the SBOE has issued guidance to an LEA, public charter school or an employee of a public charter school regarding the meaning of the Act or the Rules.

### C.    The Plaintiffs' Experiences

None of the individual plaintiffs has been the subject of a complaint for an alleged violation of the Ban, and none has been disciplined in connection with an alleged violation. None has received a warning letter or been subject to an adverse employment action in relation to the Ban.

        *1.*    *Michael Stein*

Plaintiff Michael Stein is a TEA member employed to teach English and English as a Second Language ("ESL") in the Coffee County Schools. He testified that the Supreme Court case *Plessy v. Ferguson* is an approved text and is in the state-approved English IV textbook that he uses, but he had never taught it, even before passage of the Ban, simply because he had not gotten to it. After the Ban passed, he and the English IV team determined that it was not a text that they could teach. (Stein Dep., Doc. No. 86-3 at 42–45.)[4] He explained:

> [To] begin with, I'm not entirely sure if it will or it won't [violate the Ban] because the language of the statutes includes words such as – contains words such as "include" or "promote" and I'm not sure exactly what those words mean because they are not defined in the law. So, you know, it's just generally a fear, I don't really know for sure if it will or won't. But certainly, tenet Number 14, governments should deny – should deny to any person within the government's jurisdiction the equal protection of the law, and you look at the very foundation of *Plessy versus Ferguson* – and it's abundantly clear that . . . potentially tenet Number 14 could be violated.

(*Id.* at 45.) He also stated that he believed that teaching about segregation and the desegregation movement could potentially violate the law, though it was "hard to say because there are several vague terms in this law." (*Id.* at 46.)

He testified that he still teaches the novel *1984* to his English IV students, but he fears that the novel's themes might be construed to violate the Prohibited Concepts Ban. (*Id.* at 32, 50.) He stated that he was "not really sure" whether, by teaching *1984*, he would be "'including or promoting' anything that is in this law. Those terms are vague," and undefined, so that he does not

---

[4] The court reporter's footer for this and the other deposition transcripts filed by the plaintiffs overlaps with the court's CM/ECF footer, making all of the different page numbers on each page of the documents (original transcript pagination, CM/ECF document pagination, and PageID#) indecipherable. Some of the transcripts do not actually contain original page numbers. The court employs herein the page numbers assigned by CM/ECF, as they are determinable through the PDF page navigation tools.

"know if [he is] including or promoting" some concept prohibited by the Ban. (*Id.* at 52.) He specifically pointed out that the novel concerns a privileged class that oppresses the proletariat class; women are treated unfairly in the novel; the entire novel is about a sexist meritocracy, and it also appears to raise concerns about prior generations being responsible for "the way things are set up in that novel, the totalitarian regime that's in place"; the novel's protagonist is trying to overthrow the government; and it is clearly about power relationships. (*Id.* at 52–54 (implicitly referencing or identifying Prohibited Concepts 1, 2, 3, 5, 7, 10, 12, and 14 as being implicated by the novel's themes).) Stein has not been the subject of a Prohibited Concepts complaint, but he still has "concerns" that he will receive complaints about teaching *1984*. (*Id.* at 51–52, 54–55.)

Stein also discussed teaching the novels *The House on Mango Street* and *Refugee* to his ESL students. He decided to stop teaching these works after the Ban went into effect, because he cannot determine whether those books "include" themes that would violate the Prohibited Concepts Ban, insofar as they deal with themes of ethnicity, race, sex, religion, and poverty. (*Id.* at 61–66.) He also testified that he had stopped assigning an "Article of the Week" to his class for discussion, largely because he was "fearful" that "by assigning those articles [he] would touch on some of these prohibited concepts" and just did not know if doing so would constitute "including or promoting them." (*Id.* at 58.) Stein does not allege that he was directed by his school or school district to remove any item from his curriculum because of the Ban.

Stein recalled that parents had complained about material he had assigned on two occasions, prior to the implementation of the Prohibited Concepts Ban, but neither complaint went anywhere. He was also aware of the Prohibited Concepts complaint that had been filed against educator Terri Bradshaw (who is not a plaintiff in this case), resulting in a lengthy investigation, requiring her to spend an "untold number of hours" defending herself in responding to the

complaint and investigation. (*Id.* at 67–68.)

    2.    *Kathryn Vaughn*

Plaintiff Kathryn Vaughn is an art teacher in the Tipton County Schools. She had received two complaints in about 2009 that were religion-based. Both were resolved at the school level. (Vaughn Dep., Doc. No. 86-1 at 50–51.)

Vaughn testified that, since the passage of the Ban, she has modified or omitted some of her lessons because of concerns about whether they would be perceived as violating the Ban. (*Id.* at 41–43.) In particular, she no longer teaches about artists' backgrounds the way she did prior to the Ban; she modified her lessons on the Chinese New Year; and she stopped teaching about the "immigrant experience." (*Id.* at 48, 40, 42–43.) She also removed some books from her library. (*Id.* at 32.) She was not told by school supervisors or her school district that she could not teach any particular material, and she did not raise questions about any particular topics with anyone at her school or school district, though she sought advice from the school principal. (*Id.* at 24.).

    3.    *Rebecca Dickenson*

Plaintiff Rebecca Dickenson is a librarian employed by the Blount County Schools, is a member of TEA and the president of her local TEA chapter, and she regularly attends school board meetings in that capacity. At such meetings, she has observed community members raise complaints and concerns about "books, curriculum, and what's being taught." (Dickenson Dep., Doc. No. 86-4 at 27.) She is concerned that certain books in her library and certain assignments she assigns to her students could violate the Ban, including books about the civil rights movement, Rosa Parks, and Martin Luther King, various religious holidays, and others. (*Id.* at 54–55.) In particular, she is concerned that students might feel guilt or feel that the concepts promoted by the texts are divisive. (*Id.* at 55, 57; *see also id.* at 63, 69.) However, she has continued to read books to students about the civil rights movement and to assign research assignments about civil rights

leaders and non-Christian religious holidays since the passage of the Ban. She has neither received guidance about the Ban nor been specifically told by supervisors or her school district to remove any particular lesson from her curriculum.

### 4. *Roland Wilson*

Plaintiff Roland Wilson is a TEA member and a high school Choir Director employed by the Memphis-Shelby County Schools. He teaches choir students African American spirituals and discusses their historical context, including the "horrendous and horrible" conditions of slavery. (Wilson Dep., Doc. No. 86-5 at 25.) Wilson testified that, in his view, the wording of the Act is so vague that he does not know what its intention is or whether his discussion of African American spirituals violates the Ban. (*See id.* at 32.) He stated that the Ban "impedes the teaching of history in [his] class" because he is concerned that, "if [he] bring[s] up certain matters concerning race, concerning the history of our country[,] that someone . . . is going to object or that [he] may be in trouble for what [he] say[s]." (*Id.*)

Wilson received communications from TEA informing educators that it was TEA's position that, "as long as the teacher is teaching to the Tennessee state standards, they are in compliance with the law." (*Id.* at 36 .) Wilson, however, noted that this standard was "too broad," because teachers in many disciplines—including his—have a substantial amount of discretion in choosing the materials they teach. (*See id.* at 36–37 ("[T]he standards don't tell you which songs to teach.").) Wilson has continued to teach the same songs after the enactment of the Ban as before, but he feels that there is now "just this cloud over [him]" that he does not "quite know how to navigate." (*Id.* at 41.)

### 5. *Mary McIntosh*

Plaintiff Mary McIntosh is employed as a substitute teacher by the Memphis Shelby County Schools. In the last year, in that capacity, she taught Pre-AP World History and Geography,

AP World History, Facing History and Ourselves, World History, U.S. History, and Sociology. McIntosh testified that, after the passage of the Ban, she changed her lessons to exclude parts of a unit called "We and They," including the documentary *A Class Divided* and a documentary series *Race: The Power of Illusion*, because she was "uncertain if they violated the law or not." (McIntosh Dep., Doc. No. 86-2 at 31.) She also chose not to teach the novel *Brown Girl Dreaming*. (*Id.* at 43.) Aside from making these specific changes, she testified that, "in the moment, in real time," the Ban imposes an "enormous burden every day," because it means that she is "always questioning [whether she is] going to run afoul of the law or not." (*Id.*) She further noted that "it's impossible to have an impartial discussion about some of the [Prohibited Concepts] because they are controversial." (*Id.* at 37.)

McIntosh also explained, with regard to lessons she chose not to teach, that she did not seek guidance from her school or the school district about that decision, because she could not count on a timely response, as teachers had never received the promised additional guidance on interpreting the Ban that they were promised when it was initially passed. (*Id.* at 36.) She did talk to administrators at her school and from the organization Facing History and Ourselves, but the people she talked to were not able to offer much guidance; "they were also concerned and they were working through trying to understand the law also." (*Id.* at 26–29.)

Asked whether it provided comfort to know that she was teaching materials that were part of the state-approved curriculum, she responded: "Not really because the law runs afoul of the state-approved standards and I'm not sure where my safe space is to stand." (*Id.* at 39.)

6.    *TEA*

TEA is an organization comprising education professionals from more than 140 public school districts in Tennessee. (Doc. No. 1 ¶ 10.) Its members include thousands of educators teaching kindergarten through twelfth grade in Tennessee, as well as support staff, principals,

administrators, and directors of schools. (*Id.* ¶ 13; *see also* Doc. No. 80-11, TEA Resp. to Req. for Admission No. 10.) It has not been called upon to provide legal representation to any teacher who has lost a teaching license due to a violation of the Ban, though it purports (without factual support) to have "provided support to teachers accused of violating the Act who have been forced to defend themselves in administrative procedures that could have jeopardized their licensure." (Doc. No. 91 at 14 (citing Doc. No. 80-11, TEA Resp. to Req. for Admission No. 12).)

### D. The Lawsuit

The plaintiffs filed their Complaint in July 2023, asserting a claim under 42 U.S.C. § 1983, which creates a civil cause of action for any person within the jurisdiction of the United States who has been deprived of a federal right under color of law. The right at issue is the right to due process under the Fourteenth Amendment, which requires, among other things, that an individual not be subjected to any prohibition unless the prohibition is sufficiently clear to provide fair notice of what is proscribed. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). The plaintiffs assert that the Ban is unconstitutionally vague, both facially and as applied to the individual plaintiffs, insofar as it fails to provide fair notice of what it requires or prohibits and allows for arbitrary and discriminatory enforcement. (Doc. No. 1 ¶ 20.) The plaintiffs seek a permanent injunction enjoining the defendants from enforcing the Ban, as well as a declaration that the Ban, including both the Act and the Rules, is "unconstitutional, facially and as applied." (Id. at 50.)

In May 2024, the court issued an Order denying the defendants' Motion to Dismiss, along with an accompanying Memorandum of law, finding specifically at that stage that the plaintiffs had standing to bring their claim and that the defendants failed to show that the court should abstain from resolving this dispute. The court also found that the defendants did not establish, as a matter of law, that the plaintiffs' claim that the Ban's vagueness violated their right to due process failed on the merits. *See Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024).

The plaintiffs' Motion for Summary Judgment relies heavily on the court's prior findings, while the defendants' motion largely reiterates the same arguments the court rejected in ruling on their Motion to Dismiss. Both motions raise the same issues: (1) whether the plaintiffs have standing to challenge the Ban (*see* Doc. No. 81 at 7–17; Doc. No. 84 at 13–16); and (2) whether the vagueness claims have merit (Doc. No. 84 at 17–24; Doc. No. 84 at 17–22). The defendants also argue that the plaintiffs cannot bring a facial vagueness challenge at all, because their claim does not involve First Amendment rights or challenge a law that imposes criminal sanctions, and that their as-applied claim fails because the plaintiffs have not shown that the challenged provisions have been—or will be—applied to the plaintiffs. (*See* Doc. No. 81 at 17–18.) The plaintiffs argue that any arguably constitutional portions of the Ban are not severable from the unconstitutional portions and that the court should enjoin enforcement of the Ban in its entirety. (*See* Doc. No. 84 at 29–31.)

Although the present motions essentially reargue the same issues the court addressed in ruling on the defendants' Motion to Dismiss, the procedural posture of the case is different, the parties having now conducted discovery, and the plaintiffs may no longer rely on the allegations in their Complaint to establish standing. In addition, Sixth Circuit opinions issued since this court's prior ruling—particularly *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024)—have refined the requirements for standing in the pre-enforcement context, as discussed below. Thus, despite ruling to the contrary the first time around, the court now finds that the plaintiffs have failed to carry their burden and that their claims must be dismissed for lack of standing. The court, therefore, does not reach the parties' other arguments.

### III.     THE PLAINTIFFS' STANDING

#### A.     Legal Standards

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. The Supreme Court has repeatedly recognized that the "'case or controversy' requirement is 'fundamental to the judiciary's proper role in our system of government.'" *Murthy v. Missouri*, 603 U.S. 43, 56–57 (2024) (some internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Thus, "[f]ederal courts can only review statutes and executive actions when necessary 'to redress or prevent actual or imminently threatened injury to persons caused by . . . official violation of law." *Id.* at 57 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009)).

A case or controversy exists only when at least one plaintiff "establish[es] that [she] ha[s] standing to sue." *Id.* (quoting *Raines*, 521 U.S. at 818). "[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Block v. Canepa*, 74 F.4th 400, 408 (6th Cir. 2023) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)). "These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case." *Welty v. Dunaway*, 749 F. Supp. 3d 882, 901 (M.D. Tenn. 2024).

In the "pre-enforcement context," that is, when a plaintiff challenges a law prior to the commencement of an enforcement against him, "whether the plaintiff has standing to sue often turns upon whether he can demonstrate an 'injury in fact.'" *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (quoting *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014)). The Supreme Court

has recognized that "'[a]n allegation of future injury may' satisfy the injury-in-fact requirement if the alleged 'threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Id.* (some internal quotation marks omitted) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014))

"[D]etermining when the threatened enforcement of a law creates an Article III injury" is a "difficult and 'recurring issue." *Christian Healthcare Ctrs.*, 117 F.4th at 843. The Supreme Court and the Sixth Circuit have explained that "a threat of enforcement is 'sufficiently imminent' to constitute an injury in fact if the plaintiff alleges (1) an intent 'to engage in a course of conduct' arguably 'affected with a constitutional interest,' (2) that this conduct is arguably 'proscribed by a statute,' and (3) that there is 'a credible threat' of the statute's enforcement against the plaintiff." *Id.* (quoting *Susan B. Anthony List*, 573 U.S. at 159).

Each plaintiff individually "bears the burden of establishing standing as of the time he brought this lawsuit and maintaining it thereafter." *Carney v. Adams*, 592 U.S. 53, 59 (2020); *see also Murthy*, 603 U.S. at 61 ("'[S]tanding is not dispensed in gross.' That is, 'plaintiffs must demonstrate standing for each claim that they press' against each defendant, 'and for each form of relief that they seek.'" (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021))). They must support each element of standing as to their particular claim "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Where, as here, the parties have taken discovery, the plaintiff[s] cannot rest on 'mere allegations,' but must instead point to factual evidence." *Murthy*, 603 U.S. at 58 (citing *Lujan*, 504 U.S. at 561). "And if a plaintiff cannot establish standing for any claim, a court must dismiss the [claim] for lack of subject-matter jurisdiction." *Christian Healthcare Ctrs.*, 117 F.4th at 842.

**B.    Application of Legal Principles to this Case**

The defendants acknowledge that the injury-in-fact requirement does not mean that a plaintiff must await actual enforcement of a law to have standing to challenge it. But, they argue, a plaintiff must prove an "intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the challenged law and a "*certain* threat of prosecution" if he or she engages in the prohibited conduct. (Doc. No. 81 at 8 (emphasis in original) (quoting *Crawford v. Dep't of Treasury*, 868 F.3d 438, 454, 455 (6th Cir. 2017)).) In this case, it is undisputed that no Tennessee teacher has yet been reported to the SBOE for violating the Ban since its enactment in 2021, much less disciplined by the SBOE or the Commissioner for such a violation. According to the defendants, this means that the individual plaintiffs "cannot establish a 'credible threat' or 'substantial probability' of enforcement, let alone a 'certainly impending' threat." (*Id.* at 9.)

The Sixth Circuit routinely applies the so-called "*McKay* factors," from *McKay v. Federspiel*, 823 F.3d at 969, to evaluate threats of enforcement. *See Christian Healthcare Ctrs.*, 117 F.4th at 851 (describing the application of the *McKay* factors in pre-enforcement challenges as "settled circuit law" (collecting cases)). Generally, as the court explained in *McKay*, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes." *McKay*, 823 F.3d at 868–69 (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)). Rather, in addition to "chilled speech," the court should consider the factors identified in *McKay* to determine "whether a threat of enforcement is sufficiently credible to support a claim for pre-enforcement prospective relief." *Christian Healthcare Ctrs.*, 117 F.4th at 848. These factors include:

> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely,

such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

*Id.* (quoting *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021)); *see also McKay*, 823 F.3d at 869 ("We have . . . found a credible threat of prosecution where plaintiffs allege a subjective chill and point to some combination of the[se] factors[.]") "These *McKay* factors are not exhaustive, nor must each be established." *Id.* (quoting *Online Merchs. Guild*, 995 F.3d at 550); *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that the *McKay* factors are not "a laundry list"). This inquiry "distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Id.* (quoting *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022)).

The plaintiffs in this case clearly allege a subjective chill on their speech due to the Ban. As the court already noted in addressing the defendants' Motion to Dismiss, however, "because the plaintiffs are public employees whose claims involve the performance of their duties, [this] is not a First Amendment case." *Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807. The plaintiffs are, however, placed in a position of being required, every day, to make decisions regarding compliance with the Ban. *See id.* at 803 ("The plaintiffs are not simply private individuals worried that they will do something, at some point in the future, and, then, within the discretion of some government actor, possibly be made subject to enforcement proceedings. The plaintiffs are engaged in affirmative, ongoing conduct, at the direct behest of the government, which requires them to make decisions regarding compliance with the Act *right now*.").) The vagueness of the Ban, as the court also discussed in its prior opinion, makes that obligation a difficult challenge, at best. The plaintiffs, that is, have clearly alleged an "intention to engage in a course of conduct arguably affected with a constitutional interest[] but proscribed by" some provision of the challenged law, for purposes of the first step of the standing analysis, simply because they are

required to attempt to comply with a poorly drafted, ambiguous statute every time they step into a classroom.

The rest of the standing analysis depends upon application of the *McKay* factors, which the Sixth Circuit has now stated, in no uncertain terms, governs the standing inquiry in the pre-enforcement context. *Christian Healthcare Ctrs.*, 117 F.4th at 851.

> a) *History of Past Enforcement*

Regarding the first factor, the Sixth Circuit has noted that, in situations where the state does not initiate enforcement actions on its own but instead in response to citizen complaints, the application of the law of standing is "particularly difficult." *Christian Healthcare Ctrs.*, 117 F.4th at 852. In that context, "enforcement credibility hinges on the answers to two questions: (1) How likely is anyone to file a complaint against a Plaintiff for its conduct, and (2) if such a complaint were filed, what is the likelihood that Defendants' actions in response would cause a *cognizable injury*?" *Id.* (emphasis added). In other words, the court distinguishes between mere citizen complaints and enforcement actions, with only the latter capable of causing a "cognizable injury." *Id.*; *see also id.* at 853 (turning to the question of the "likelihood of injury in the event a complaint is submitted"). In *Christian Healthcare*, although no past enforcement action had been initiated against the plaintiffs, the plaintiffs adequately alleged the existence of citizen complaints and, more importantly, alleged that the state prosecuted violations of the challenged statute. *Id.* at 849. The court also noted that, "given the short duration" of the statute's application to the plaintiffs' practices, it logically followed that there would be limited evidence of actual enforcement of the challenged portions of the statute. *Id.* at 849–50.[5]

---

[5] Notably, in *Christian Healthcare*, the court reviewed and affirmed in part the district court's granting of a motion to dismiss for lack of standing, prior to discovery.

In the present case, the Ban has been in place for nearly four years. The plaintiffs have established that numerous citizen complaints have been filed (exactly how many is unclear), but there have been no findings at the local level that any teacher in the state was in violation of the Ban. There have been, as set forth above, three appeals—presumably by disgruntled complainants—but no finding at the state level that any teacher has violated the Ban, no enforcement action, and no discipline.

The plaintiffs point to the complaints themselves and the heated political environment in which teachers operate as making it "abundantly clear that 'the threat of future enforcement of the [challenged statute] is substantial'" and "real," as opposed to "theoretical or 'chimerical.'" (Doc. No. 90 at 11 (first quoting *Susan B. Anthony List*, 573 U.S. at 164; then quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007); and then quoting *Susan B. Anthony List*, 573 U.S. at 164).) The plaintiffs fail to acknowledge that the complaints, standing alone, while arguably sufficient at the pleading stage to permit them to proceed to discovery, are not sufficient at the summary judgment stage to establish a history of past enforcement, particularly in light *Christian Healthcare*. Citizen complaints are simply not the equivalent of enforcement by the defendants.

In reaching that conclusion, the court recognizes that the plaintiffs' subjective fears of enforcement are not unreasonable. To the contrary, given the national and local political climate and the language of the statute, any teacher whose subject matter touches on history, culture, or current events—which is to say, nearly every imaginable course of study—has reason to fear complaints by parents or students who, rightly or wrongly, perceive a particular lesson to "include" (even if not promote) a Prohibited Concept. It is plausible that Prohibited Concepts complaints may be lodged against one or more plaintiffs. But the plausible fear of complaints is not the sole

question.[6] As set forth above, the second half of this inquiry is, "if such a complaint were filed, what is the likelihood that Defendants' actions in response would cause a cognizable injury?" *Christian Healthcare Ctrs.*, 117 F.4th at 852. So far, the LEAs to which citizen complaints have been made have repeatedly found no violation of the Ban, and only three appeals have been filed. As a result, the defendants have had little or no opportunity even to weigh in on the issue of how they will interpret the statute, and the plaintiffs cannot show that the answer to the question of how likely the state is to act in such a way as to "cause a cognizable injury" is "certain" or even "very likely." Any conclusion to the contrary would rest entirely upon speculation.

### b) Warning Letters

"It is undisputed that no 'enforcement warning letters' have been 'sent to the plaintiffs regarding their specific conduct.'" *Id.* at 850 (quoting *McKay*, 823 F.3d at 869).

### c) Statutory Attributes

The third factor is whether the statute at issue has some attribute that "makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Id.* (quoting *McKay*, 823 F.3d at 869). In *Susan B. Anthony List*, the Supreme Court recognized, on a general level, that a statute permitting "any person" to "file a complaint" "bolstered" the credibility of the threat of enforcement. *Susan B. Anthony List*, 573 U.S. at 164; *see id.* ("Because the universe of potential complainants is not restricted to state officials who are

---

[6] The Supreme Court has expressly found that plaintiffs bringing a pre-enforcement challenge to a statute cannot establish standing by showing that they incurred costs and burdens based on a reasonable, non-paranoid fear of surveillance under the challenged law. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (holding that, to conclude otherwise would "transform [the plaintiffs'] standing burden from one requiring a showing of actual or imminent . . . interception to one requiring a showing that their subjective fear of such interception is not fanciful, irrational, or clearly unreasonable"). In other words, a fear of enforcement may be both reasonable and speculative.

constrained by explicit guidelines or ethical obligations, there is a real risk of complaints from, for example, political opponents."). In that case, however, the complaints at issue had to be submitted by a person with "personal knowledge" in the form of an affidavit sworn under penalty of perjury, and, once a complaint was filed, the state's enforcement apparatus was automatically kicked into gear. *See* Ohio Rev. Code Ann. § 3517.153(A). Similarly, in *Christian Healthcare*, the Michigan laws at issue provided that the filing of a complaint immediately involved the state in responding by investigating the complaint to determine whether to issue a formal discrimination charge. *See Christian Healthcare*, 117 F.4th at 939 (citing Mich. Comp. Laws §§ 37.2602(c)–(d), 37.2605; Mich. Admin. Code R. 37.4(10), 37,6(1), 37.11(1), (6), 37.14(1)).)

In the Tennessee statute and regulations at issue here, "complainant" is broadly defined to include a current student, parent of a current student, or current employee of "the LEA or public charter school in which the allegation(s) arose." Tenn. Comp. R. & Regs. 0520-12-04-.02(6). However, a complaint must be filed at the local level, with the LEA or public charter school in which the allegations arose. Tenn. Comp. R. & Regs. 0520-12-04-.05(2). Complaints are not filed directly with the state defendants, and the filing of a Prohibited Concepts complaint does not automatically implicate the defendants or initiate a state investigation or enforcement action. Instead, only if the local determination of the complaint results in an appeal is the state machinery set in motion. In other words, as the defendants argue, the "universe of potential enforcers" is not entirely unconstrained. Only after investigation by local officials and a written determination does the opportunity to appeal arise, and only if an appeal is taken is the state called upon to initiate an investigation or an enforcement action. *See* Tenn. Comp. R. & Regs. 0520-12-04-.05(10); Tenn. Comp. R. & Regs. 0520-12-04-.07(11). Thus far, given that only three appeals have been pursued, it is not predictable that a complainant will choose to appeal or that the state's involvement will

become necessary simply because a complaint is filed.

In other words, in this particular case, the fact that a complaint may be initiated by any current student, parent, or employee of the LEA in which the incident arose does not actually tend to "make[] enforcement easier or more likely." *Christian Healthcare Ctrs.*, 117 F.4th at 850. Although the court found at the Rule 12(b)(6) stage that this factor did not impose a barrier to standing, at this juncture, and again in light of the additional guidance offered by *Christian Healthcare*, the court finds that this factor does not weigh in favor of the plaintiffs.

### d) Disavowal

The plaintiffs also point to the defendants' refusal to disavow enforcement of the Ban against them, even as to "state- or district-approved materials or lessons," to argue that this factor weighs heavily in favor of finding that they have established standing. (Doc. No. 90 at 14.) The defendants argue that, in the absence of the identification of a specific "future intended instruction that may violate the Act, it is not necessary to disavow enforcement." (Doc. No. 81 at 13.)

The Sixth Circuit has found the disavowal factor satisfied where, although government officials had not threatened to enforce a statute against a particular party, "they also have not explicitly disavowed enforcing it in the future." *Green Party v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979)); *see also Platt v. Bd. of Comm'rs*, 769 F.3d 447, 452 (6th Cir. 2014) (finding this factor met because, "when directly asked at oral argument, the State refused to disavow the enforcement of the Code as applied to Platt); *Universal Life*, 35 F.4th at 1035 (holding that a district attorney had not disavowed enforcement of a criminal law because he never "provided clear assurances" that he would not prosecute the plaintiffs).

The defendants in this case have not provided any assurances that the plaintiffs will not be subject to an enforcement action in the event that an appeal concerning any of the plaintiffs makes

its way to them. The court finds that this factor leans in favor of the plaintiffs, though the absence of a history of enforcement, as discussed above, diminishes the likelihood of future enforcement and, consequently, the weight this factor carries in this particular case.

*e)      Weighing the McKay Factors*

Even if the court considers the disavowal factor to weigh strongly in favor of the plaintiffs, it does not, standing alone, outweigh the other factors that weigh against standing. The non-existence of any history of past enforcement (despite the law's having passed nearly four years ago and the filing of numerous complaints at the local level), the lack of warning letters, and the absence of any strong statutory attributes making enforcement particularly easy, considered together, lead the court to conclude that the individual plaintiffs lack standing to challenge the Ban. The plaintiffs simply have not established that the "'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Christian Healthcare Ctrs.*, 117 F.4th at 848 (quoting *Universal Life Church*, 35 F.4th at 1034).

If the individual plaintiffs lack standing, then TEA lacks associational standing as well, which the plaintiffs concede. (*See* Doc. No. 90 at 19 ("Because the individual teachers have standing . . . , so, too, does TEA.").) *See also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (explaining that an association must "establish[] that at least one identified member had suffered or would suffer harm"). The court, therefore, lacks subject matter jurisdiction in this case.

The court reaches this conclusion uneasily, for the same reasons incorporated in the denial of the defendants' Motion to Dismiss, rejecting the defendants' arguments that the Ban is not unconstitutionally vague and, therefore, that the plaintiffs' claims fail on the merits. As the court stated in its previous opinion:

> "[W]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine" whether a violation has occurred, "but rather the indeterminacy of precisely what" standard the law imposes for finding a violation

in the first place. *United States v. Williams*, 553 U.S. 285, 306 (2008) (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). The Court has recognized that that danger is particularly strong when a statute uses terms incorporating "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* (collecting cases). That is exactly what has happened here.

The Act does not simply use language that is sloppy or overly general; the entire Act is built around unrestrained appeals to abstract principles with contestable moral and political content—such that the practical meaning of the Act must, by definition, depend in significant part on the political, social, and moral assumptions of the party enforcing it. Every or nearly every concept prohibited by the Act is poorly defined in that way, set out in language that might be at home in an angered blog post or an opinion column but which, when imported into a legal code, is manifestly unworkable.

*Tenn. Educ. Ass'n*, 732 F. Supp. 3d at 807. Having concluded that the plaintiffs lack standing means, however, that the court cannot reach the merits of their substantive claims. Such a challenge must await suit by a plaintiff with more concrete claims of injury-in-fact. Until then, every teacher in Tennessee will labor under the burden of wondering what they are and are not allowed to say in class.

## IV. CONCLUSION

Because the court has concluded that the plaintiffs lack standing to bring their claims, the defendants' Motion for Summary Judgment (Doc. No. 80) will be granted, and the plaintiffs' parallel motion (Doc. No. 83) will be denied. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge